# CHARLESTON

STATE *v.* SOUTHERN COAL & TRANSPORTATION CO.

Submitted September 15, 1910.   Decided December 10, 1912.

1.   FISH—*Pollution of Streams—Propagation of Fish—Indictment.*
     An indictment under Code of 1906, ch. 62, sec. 6a, serial sec. 2768, is not bad for want of allegation that the stream is one fit for propagation of fish or in which fish are propagated. (p. 471).

2.  SAME—*Ownership of Fish—Protection—Statutes.*

   The state is owner of the fish in its streams, and as such, under its police power, may enact legislation to protect the propagation of fish from injury from placing in, or allowing the entrance into, streams of any matter of any kind deleterious to the propagation of fish.   (p. 473).

3.  SAME—*Waters and Water Courses—Pollution—Saw Dust— Other Deleterious Matter.*

   Section 6a, ch. 62, serial sec. 2768, Code of 1906, making it an offense to put into a stream sawdust or any matter deleterious to the propagation of fish is a valid exercise by the state of its police power, and an operator of a coal mine can assert no right contrary to its enactment, to drain sulphur or mine water from his mine into a stream, deleterious to the propagation of fish, though such stream be the natural receptacle of such drainage, or it be impracticable to drain the mine otherwise. (p. 472).

Error to Circuit Court, Barbour County.

The Southern Coal & Transportation Company was convicted of running sulphurous water into a stream, and it brings error.

*Affirmed.*

*Blue & Dayton, E. A. Brannon,* and *John Bassell,* for plaintiff in error.

*William G. Conley,* Attorney General, for the State.

BRANNON, PRESIDENT:

The Southern Coal and Transportation Company was convicted under an indictment charging it with having thrown into a water course, known as Stewart's run, sulphur water injurious to the propagation of fish.

The defendant points out that the indictment is defective. It charges that the defendant "Did unlawfully throw in a water course, known as Stewart's run, sulhpur water, the said sulphur water being deleterious to the propagation of fish." Counsel specifies as a defect in the indictment that it fails to allege that Stewart's run is such a stream as permitted the propagation of fish. We do not sustain this motion to quash. The statute on which the indictment is based is sec. 2768 of the Code of 1906, which reads as follows: "It shall be unlâwful for any person, firm or corporation, to throw in, or allow to

enter, any stream or water course, in this State, sawdust or any other matter deleterious to the propagation of fish. Any person, firm or corporation violating any of the provisions of this section shall be guilty of misdemeanor, and fined not less than twenty-five dollars, nor more than one hundred dollars for each and every offense." The statute does not say that the pollution must be of a stream in which fish are propagated. It says "any stream or water course." Suppose the particular run is not one in which fish propagate, still it will carry down to a lower stream, wherein fish are found, the destructive matter thrown into the stream. It cannot be possible that the Legislature meant to except streams in which fish are not propagated when it has not specified the exception. One stream runs into another. The object is not only to protect fish in the little streams, but also to prevent the carriage by them of deleterious matter into streams below. There is no such exception by the letter of the statute, and there is no reason that a court should insert such an exception; but there is reason that it should not, because it would thus defeat what must have been the design of the Legislature.

It is again contended that as the general word "sawdust" is used in the statute, other deleterious matter must be of the same nature as sawdust, under the rule that where there are general words following particular or specific words the former must be confined to things of the same kind as the specific words. This is not applicable in the present case. It would defeat the object of the statute. It would allow the pollution of water courses by the introduction into them of many things not akin in chemical nature to sawdust, yet highly hurtful to fish. The intent of the Legislature is the thing to be looked at. It is the protection of fish. We cannot think for a moment that it was the intention to limit deleterious matter to such matter as possesses the same hurtful qualities as sawdust. That would afford small protection of fish from the many kinds of deleterious matter. Notice that the section prohibits the introduction into the stream of sawdust, "or any other matter deleterious to the propagation of fish." Notice the word "other." So it be matter that is deleterious to the propagation

·of fish, whether of the same nature of sawdust or not, it is prohibited by the statute.

The defendant complains that the court erred in refusing the following instruction: "The court instructs the jury that if they believe from the evidence that defendant is operating a ·coal mining plant at Berryburg in the county of Barbour, and that in operating said plant in the mining and removing of ·coal, water is found, that it is then the duty of said defendant, by the laws of the State, to remove or drain such water from its mine, by such means as are reasonable and practical." Counsel would tell us that there is another statute commanding operators of coal mines to drain them and that this would ·excuse the defendant in this case; that it had a right to obey the drainage statute, and in doing so must necessarily have drained the mine water from the coal mine. That is to say that mine owners are excusable for draining mine water into streams, by reason of the statute requiring the drainage of mines. We cannot say that these statutes may not exist, and each receive a practical construction without disharmony. The Legislature has not said that the mine may be drained though it destroys the fish streams of the state. The statute on which the prosecution rests contains no such exception. The mine owner, if he carries on that business, must so drain his mine or dispose of the copperas and sulphur water so as not to destroy the fish streams of the state. That is his lookout. As he is embarked in that business, he must take the responsibilities. This instruction would give complete justification to the mine operator, though the drainage would destroy the fish.

Complaint is made that the court refused an instruction that as the water discharged from ·the mine was what is commonly known as sulphur water, and that it is a product of nature, and that it is necessary to discharge such water from the mine, and that there is no known reasonable or practical way, whereby the defendant could eliminate the sulphur and other objectionable ingredients in such water before discharging the same from its mine, before letting it enter the water course, and that the water course is the natural drainage for such water to take, then the verdict must be for the defendant. We do not suppose that it is contended that the act is unconstitutional; but it does

amount to the claim that the right of the owner to drain mine water into a stream is paramount to the right of the state to preserve its fish. It amounts to the claim that though the state had enacted for the preservation of fish the broad section above given, still it is subject to a paramount right in the mine owner to drain his mine in his own way, regardless of the harm which it may do the fish. Here we have the broad statute meant for the great purpose of the preservation of fish. Fish have always been regarded by the government as very valuable for sport and food. It may be said that no government fails to make provision for their propagation and preservation. As to its power to do so under its police power there can be no question. The Supreme Court of the United States has held thus: "It is within the power of a State to preserve from extinction fisheries in waters within its jurisdiction, by prohibiting exhaustive methods of fishing, or the use of such destructive instruments as are likely to result in the extermination of the young as well as the mature fish." *Lawton* v. *Steele*, 152 U. S. R. 133. In 1 A. & E. Ann. Cases, 948, will be found the case of *State of Ohio* v. *French,* which holds that the Legislature may provide for the protection of the fish, and may declare nets used contrary to law a public nuisance, and that such statute is constitutional. The case of *People* v. *Truckee Lumber Co.,* 116 Cal. 397, 58 Am. St. R. 183, holds that fish within the waters of a state constitute the most important part of that species of property commonly designated as "wild game," the general right and ownership of which is in the people of the state. The right to protect such property for the common use and benefit is one of the recognized prerogatives of the sovereign. It also holds that the right of the state to protect fish is not confined to navigable or public waters, but extends to all waters within the state, public or private, where the animals are accustomed to resort for spawning or other purposes, and of which they have freedom of passage to or from the fishing grounds of the state. The state owns the fish in its streams and has ample power to preserve and protect them from destruction under its police power, and private right and convenience must yield to it. This right of the state is abundantly sustained by the highest authority. *McCready* v. *Virginia,* 94 U. S. R. 391; 13

Am. Ency. L. 556; 19 Cyc 987 and 1006; *Greer* v. *Connecticut,*
161 U. S. 519; *Hudson County* v. *McCarter,* 209 U. S. R. 349.
If then by this instruction it is intended to assert any pref-
erential right of a mine owner to drain his mine of mine
water, though it destroys fish, we cannot assent to it. We have
not in hand the question, the very important question, of the
right of a riparian owner in an action against a coal mine
operator to drain his mine to the pollution of the water and
destruction of fish. It may be useful to cite authorities bearing
on that question. *State* v. *Michael,* 47 W. Va. 789, contains
an expression favorable to the liability of the mine owner.
*Trevett* v. *Prison Association,* 98 Va. 332, 81 Am. St. R.
727, goes to sustain the ｌaction of the riparian proprietor.
*Shoffner* v. *Sutherland,* 111 Va. 298; *Levaronia* v. *Miller,* 91
Am. Dec. 692; *Wixon* v. *Base River Co.,* 85, Am. Dec.
69; *Hunter* v. *Taylor,* 16 Ky. L. R. 159 and 190;
*Tenn. Coal Co.* v. *Hamilton,* 46 Am. St. R. 48. On the other
hand the defence in this case relies on the case of *Pa. Coal
Co.* v. *Sanderson,* 113 Pa. St. R. 126, 57 Am. R. 445, as deny-
ing the liability of the coal operator. That case was three
times decided favorably to the land owner, but when it came
before the court for the fourth time the mine owner was held
exempt from liability on the ground that the great coal in-
dustry called for a right superior to that of the riparian owner.
This case in its last decision is strongly condemned in section
518 B. Vol. 2 of Farnhan on Water and Water Rights. It is
also repudiated by cases cited in 10 A. & E. Ann. Cases 585.
That case was decided with the dissent of three out of seven
judges. I have shown above that the state owns the fish and
the control of the streams in which they are; that under its
police power it may adopt any legislation for the preservation
of fish and game. We have before us in this case a penal statute
by which the state as chief game warden has under its wide
power declared that no matter deleterious to the propagation
of fish shall be cast in any stream of the state. The state has
settled the rights as between itself and coal mine operators. It
has stamped with total prohibition such an act. It has left us
no right or power to enter into a comparison of right between
itself, as the preserver of fish, and coal mine operators. As I

have said above all nations preserve the game. The American states have done so. Virginia and West Virginia by their statutes do so. Authorities above accord the state ownership of fish in streams, and full power of regulation outside of statute. This common law right vested in the state has been embedded in a statute enacting that "The ownership of, and title to, all wild game, wild birds, both resident and migratory, and all fishes in the state of West Virginia, are hereby declared to be in the State." Acts of 1909, ch. 60, Supplement Code of 1909, sec. 2792 a. 1.

The state is superior to private right. By the statute on which this indictment rests the state has totally prohibited the putting into any stream of any matter deleterious to fish. If we sustain this instruction we take from the state its paramount authority and give it to the mine operator. Reflect that it is the state right that is to be subordinated. The Pennsylvania case would not go so far. It is useless to tell us that the coal mining industry of the state is vast, and may be damaged. The Virginia court in passing on the respective rights of land owners on a stream and lumber operators, in *Shoffner* v. *Sutherland,* 111 Va. 301, said: It is insisted by the appellant's counsel that restraining sawmill operators from casting sawdust into the streams along which they are operating will be very hurtful to the vast lumber interests of the southwestern part of the state and will hinder the development of that great source of wealth.

"It would," as was said in *Townsend* v. *Norfolk Ry. Co.,* 105 Va. at p. 49, 52 S. E. 978, 115 Am. St. Rep. 842, 4 L. R. A. (N. S.) 87, "be a source of regret if, in the administration of justice by the establishment and enforcement of sound principles the prosperity of our people should be hindered or checked, but it would not only be a source of regret, but of reproach, if material prosperity were stimulated and encouraged by a refusal to give to any citizen a remedy for wrongs he may sustain, even though inflicted by forces which constitute factors in our material development and growth. Courts have no policies, and cannot permit consequences to influence their judgment further than to serve as warnings and incentives to

thorough investigation and careful consideration of the causes submitted to them."

Judgment affirmed.

*Affirmed.*