CHEAT MOUNTAIN CLUB v. WEST VIRGINIA PULP & PAPER CO.

(District Court, N. D. West Virginia. May 14, 1913.)

1. FISH (§ 6*)—POLLUTION OF STREAM—REMEDY—INDICTMENT—INJUNCTION.
Where the owner of certain forest land, leased to complainant's predecessor for fishing and hunting, proceeded to conduct certain lumbering operations thereon, and polluted a trout stream on the land, the remedy by indictment was not exclusive, but injunction might be granted to stay further pollution and destruction.
[Ed. Note.—For other cases, see Fish, Cent. Dig. § 14; Dec. Dig. § 6.*]

2. INJUNCTION (§ 47*)—DESTRUCTION OF ROADS—LEASES.
Where a lease of forest lands for hunting and fishing provided that none of the rights and privileges granted by the lease should interfere with, limit, or hinder the owners in their operations as lumbermen, farmers, or grazers thereon, an injunction would not lie to restrain the owners from destroying roads on the property, built under the lease, where the acts were done by the owners, not maliciously, but in their legitimate lumbering operations.
[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 100; Dec. Dig. § 47.*]

3. LANDLORD AND TENANT (§ 123*)—GAME PRESERVE—TAKING TIMBER—REPAIR OF BUILDINGS—"LODGE."
Where a lease of 50,000 acres of forest land for fishing and hunting to an incorporated club, which spent $25,000 in building a clubhouse and other buildings, roads, etc., provided that it should continue for 50 years, with the right to the lessees to cut timber on the land and use the same to build one or more camps or lodges, and the lessees fenced and cleared 10 acres of ground, to be used in connection with the clubhouse, the owners of the land, after the expiration of 25 years without

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

objection, were not entitled to prohibit the lessees' further use of the clubhouse and 10-acre tract, nor the taking of timber for the repair of the clubhouse; the term "lodge," as used in the lease, being sufficiently broad to include such house.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 435, 436; Dec. Dig. § 123.*

For other definitions, see Words and Phrases, vol. 5, p. 4226.]

Suit by the Cheat Mountain Club, a corporation, against the West Virginia Pulp & Paper Company. Decree for complainant.

William E. Baker, of Elkins, W. Va., for plaintiff.

Talbott & Hoover, of Elkins, W. Va., for defendant.

DAYTON, District Judge. Sifted out of the mass of evidence taken, the facts involved in this controversy are substantially these:

Some time before January, 1887, A. H. Winchester had been engaged as agent for W. S. Dewing & Sons, in purchasing titles to large bodies of lands, situate on Shavers fork of Cheat river, in Randolph and Pocahontas counties, this state. These purchases had by that time reached an aggregate of about 50,000 acres. The nearest railroad station to these lands was then at Philippi, 54 miles away. They comprised many miles of unbroken forest. Winchester met Wm. Seymour Edwards at Beverly, attending to some legal business, and induced him to ride homeward with him through these lands. They discussed the fine opportunities for fishing and hunting presented by this almost trackless wilderness. The result was the organization and incorporation of the "Sportsman's Association of Cheat Mountain," in which Edwards interested a large number of prominent men at Pittsburg, Pa., and elsewhere, and the execution, acknowledgment, and recordation of the contract set forth in full in the margin,[1]

---

[1] Exhibit A.

This indenture, made this 12th day of January, 1887, between A. H. Winchester, of Randolph county, West Virginia, party of the first part, and the Sportsman's Association of Cheat Mountain, a corporation organized under and pursuant to the laws of the state of West Virginia, party of the second part, witnesseth:

That for and in consideration of the sum of one ($1.00) dollar, in hand paid by the party of the second part, the receipt whereof is hereby acknowledged, the party of the first part doth hereby grant, demise, and let unto the party of the second part for the full term of fifty years from the date hereof, for the sole purpose of a hunting estate and the protection and propagation of game and game fish, all that certain tract or boundary of land known as the "Winchester Purchase" (subject, however, to the limitations hereafter named), bounded and described as follows: Being all that certain boundary of land lying upon the waters of Shavers fork of Cheat river, and upon Cheat Mountain range, in the counties of Randolph and Pocahontas, W. Va., bounded on the northerly side by the old Staunton and Parkersburg pike and running southerly for quantity, and containing about fifty thousand acres, more or less (covering all of Cheat waters south of said pike). Together with the right of way into, out of, over, and across said land, the right to build private roads into, out of, over, and across the same, the right to use water from the same, the right to cut timber upon the said land and use the same for the purpose of building one or more camps or lodges upon the said land, and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

between Winchester and the association, subsequently ratified by Dewing, and subject to which these lands are held to-day by the West Virginia Pulp & Paper Company, a Delaware corporation. The "Sportsman's Association of Cheat Mountain" was succeeded through purchase by the "Cheat Mountain Club," a corporation under the laws of this state. This contract was not without very valuable consideration to its grantors. Land titles in that section were in an unsettled condition, and to have a large boundary like this held under one lease, by a tenant who, at its own expense, would erect buildings thereon and make such clearing and improvements as would meet the law's requirements in establishing adverse possession, was very desirable. This Sportsman's Association, incorporated, did make improvements to the extent of probably $25,000. They built roads, paths, camps, a fish hatchery, outbuildings and a clubhouse, with a superintendent's dwelling house attached thereto. Winchester was present and insisted upon his selection of the site for this clubhouse, and his suggestion in regard thereto was adopted. He substantially indicated and marked out the ground that should be occupied. This ground embraced about 10 or 12 acres, and was sufficient for the clubhouse, outbuildings, and fish hatchery to stand upon, and also to furnish an acre garden and pasture for a couple of cows and a couple of horses. The necessity for keeping this stock was apparent.

The original association, at least partially, cleared out this 10 acres of ground, and it and its successor were allowed full and peaceable enjoyment thereof and of the buildings thereon until the 27th of March, 1912, some 25 years after the execution of the lease, when Slaymaker, defendant's manager, by letter notified the latter that:

"We expect, from now on, to use our property on which the clubhouse is located, including the meadow lands south of where the clubhouse stands, and we therefore beg to inclose you a copy of the original lease made by A. H. Winchester, * * * and especially call your attention to the fact that

the right to build, and use rent free when built, such camps or lodges as may be deemed necessary by the party of the second part, and the right to take coal and wood from the said land for the domestic use of said camps and lodges.

But this lease is made subject to the following expressed conditions, to wit: (1) All rights, titles, and privileges under this indenture demised are and shall be subject to the right of the owners of the land herein described to prevent waste and unnecessary injury to the property or commercial values thereof, through the exercise of any of said rights by the party of the second part, its agents or servants. (2) None of the rights and privileges under this indenture granted shall in any way interfere with, limit, or hinder the owners of the said land in their operation as lumbermen or farmers or grazers thereon. (3) It is understood that no rights and privileges by this indenture granted shall prevent A. H. Winchester or his invited friends from exercising freely any and all the rights and privileges herein granted. (4) The premises herein described and demised shall be used for the purpose herein specified and be subject to the conditions herein set out, and for none other whatsoever.

To have and to hold the said demised premises for the aforesaid purposes, and subject to the aforesaid conditions, for the full term of fifty years from the date hereof.

Witness the hand and seal of the party of the first part.

A. H. Winchester. [Seal.]

this lease only gives to the association the right to hunt, protect, and propagate game and game fish on the lands. * * * You will notice in this lease that the association has the right and privilege of building private roads into, out of, over, and across the lands covered by that lease, together with the right to use water, the right to cut timber upon said lands and use the same for the purpose of building one or more camps or lodges, and to use the same, rent free, when built, together with the right to take coal and wood from the lands for domestic use for said camps and lodges. We call your special attention to the fact that this lease reserves to the owners of the land the right to prevent unnecessary injury or waste to the property over which the lease was given, and the rights and privileges conveyed by that lease were in no way to interfere with, limit, or hinder the owners in their operations as lumbermen, farmers, or grazers. We would therefore notify you that we expect to take charge of all of the improved land around and near the clubhouse, and to clear additional lands in that section, and we cannot allow any timber to be taken from our property for the purpose of repairing or rebuilding the clubhouse."

In addition to this Shaffer, defendant's superintendent, informed Degler, the club's superintendent, that there was no use going ahead with the fish hatchery or with improvements, as the company expected to utilize all that land. Then the defendant built its railroad for lumbering purposes along the stream on which the fish hatchery was located, built its lumber camps, wherein some 75 men lived, its stables, and hog lot on its banks, and took possession of something over 2 acres of the 10 or 12 that had been used in connection with the clubhouse, plowed them up, and planted them in potatoes. From all which and other evidence in the cause, it is very manifest that this defendant had become tired of this tenant of 25 years standing, holding this large boundary of 50,000 acres in open, notorious, and adverse possession for it and its predecessors in title at an expense of many thousands of dollars, and wanted to get rid of it as speedily as possible, and to this end, after 25 years of liberal treatment, it became the strictest of strict constructionists and stands on what its manager conceives to be the very letter of its bond.

The plaintiff thereupon filed its bill in the circuit court of Randolph county, seeking an injunction against the defendant's pollution of the stream upon which its fish hatchery was situate, against the destruction of its roads and paths into, out of, and over the property, and from interference with the 10 or 12 acres used by it for so many years in connection with its clubhouse. That court announced its purpose to grant a temporary injunction as prayed for, but before doing so the defendant filed its petition and bond and the cause was removed to this court. Here application was made for a temporary injunction, but, the defendant having promptly filed its answer, denying most of the allegations of the bill and insisting upon its manager's construction of the lease, I declined to grant such temporary injunction, reserving all action until final hearing upon the merits.

[1] There can be no reasonable doubt from the evidence that the defendant polluted the stream upon which the fish hatchery was situated and from which it drew its water supply. Horse, hog, and human excrement, as well as tin cans, ashes, and kitchen refuse, were deposited in it. The personal examination of the state fish and game warden and his evidence in the case seems to me clearly to establish

that such matter was destructive of the trout which the plaintiff was seeking to propagate in its hatchery. While such pollution, by express statute in this state, is prohibited and made subject to criminal prosecution (State v. Southern Coal & Transportation Co. [W. Va.] 76 S. E. 970), yet it being clearly shown by the evidence that the plaintiff is specially damaged in the destruction of its fish and in the operation of its private hatchery, admittedly authorized to be maintained under the terms of the lease, I do not think the remedy by indictment is exclusive, but that injunction will and must be maintained at the instance of plaintiff to stay further pollution and destruction.

[2] Touching the question of the obstruction and destruction of the roads built by plaintiff, for which injunction is sought, I do not think it can be granted, for the reason that such obstruction or destruction is clearly shown not to have been done maliciously, but in the defendant's legitimate lumbering operations, expressly reserved to it under the terms of the lease.

[3] The chief bone of contention in the case is touching the 10 or 12 acres of land surrounding the clubhouse and hatchery, which the plaintiff and its predecessor had been using for so many years, and which had been substantially marked out and assigned for such use by Winchester when the clubhouse site was originally selected. In view of the fact that counsel so radically disagree as to what this lease means in this particular, I think it well to recall some of the hornbook rules applicable to its construction: (a) An agreement should receive that construction which will best effectuate the intention of the parties; and (b) such intention of the parties is to be collected from the whole agreement. (c) A contract will, if possible, be construed so as to render it reasonable rather than unreasonable. (d) Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent; and (e) if such meaning and intent is not clear, the court will consider the circumstances under which the contract was made, the subject-matter, the relation of the parties, and the object of the agreement, in order to ascertain their intention, and for this purpose parol evidence is admissible. (f) Contracts of lease will generally be construed most strongly against the lessor; and (g) in case of doubt, weight will be given the construction placed upon the contract by the parties. Clark on Contracts (1st Ed.) 599 et seq.

Applying these rules to the construction of this lease, will any one reasonably contend that a number of intelligent men would organize a corporation. subject themselves to an expense of near $25,000, build a clubhouse and other buildings in an unbroken forest, miles away from any other habitation and from market, with no right to use a foot of ground except that alone upon which the buildings stood? Is it to be presumed that a lessor having 50,000 acres of land, securing such a tenant, was so jealous of the use of the land as to consider and design such a restriction? The keeping of a couple of cows there, so far away from where milk and butter could be obtained, and the keeping of a couple of horses to get in and out of this wilderness, to build the roads, camps, and lodges provided for by the lease, were

necessities, and the ground to maintain them upon was likewise. In short, this 10 acres of ground was the necessary *curtilage* to the club-house, hatchery, and other buildings, and the purpose for which the lease was given, and that it was so understood by the parties is clearly shown by two facts: First, that the original lessor, Winchester, marked it out and assigned it as such; and, second, that the owners of the land for 25 years, without objections, allowed it to be used as such. It therefore follows that the taking possession thereof, or any part thereof, against plaintiff's protest, by the defendant, was and will be unwarranted until this lease is either surrendered or terminated.

Finally, the contention of defendant that no timber can be used for the purpose of repairing the clubhouse is in my judgment untenable. The lease was for 50 years. It expressly provides that timber can be taken for the purpose of building camps and lodges upon the land and to enjoy the same. The term "lodge," used in this lease, is broad enough to include the building called the "clubhouse," and defendant's construction of the lease would therefore involve the absurdity that the plaintiff could take timber to build a new house, but not the lesser quantity required to repair and maintain the old.

The plaintiff is entitled to the relief prayed for in its bill in the particulars herein set out, and decree will be entered accordingly.