## Wytheville.

### TREVETT v. PRISON ASSOCIATION OF VIRGINIA.

#### JUNE 14, 1900.

1. PRISON ASSOCIATION—*Public Corporation.*—The Prison Association of Virginia is not a public corporation, and, though of a benevolent character, it is responsible for its torts.

2. RIPARIAN RIGHTS—*Pollution of Water—Privies.*—The erection of privies for the accommodation of a large number of people, and the discharge, through sewers, of refuse water, urine and excrement into a stream is such a pollution of the stream as entitles a lower riparian owner to recover damages for the injury thereby inflicted. Privies are *prima facie* nuisances, and, even when necessary or indispensable, the persons erecting or using them are liable for all injurious consequences flowing from building or allowing them to remain in such condition as to annoy others in the enjoyment of their property.

3. RIPARIAN RIGHTS—*Pollution of Water.*—The natural pollution of water in its flow through populous regions of country cannot, ordinarily, be restrained. But any use of a stream that materially fouls and adulterates the water, or the deposit or discharge therein of any filth or noxious substance that so far affects the water as to impair its value for the ordinary purposes of life; or anything which renders the water less wholesome than when in its ordinary state, or which renders it offensive to taste or smell, or which is naturally calculated to excite disgust in those using the water for the ordinary purposes of life, will constitute a nuisance which a court of equity will enjoin, or for which a lower riparian owner injured thereby is entitled to redress.

Error to a judgment of the Circuit Court of Henrico county, rendered July 13, 1899, in an action of trespass on the case,

NOTE BY THE REPORTER.—Judge Riely was not present when this opinion was delivered, but was present at the argument, participated in the conference and concurred in the opinion after it was prepared.

wherein the plaintiff in error was the plaintiff, and the defendant in error was the defendant.

*Reversed.*

The opinion states the case.

*A. R. Courtney* and *H. R. & J. G. Pollard,* for the plaintiff in error.

*Robert Stiles* and *C. V. Meredith,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

Plaintiff in error sued the Prison Association of Virginia in an action of trespass on the case, and in his declaration states that he is the owner of a tract of land in the county of Henrico, upon which he and his family reside and carry on a dairy and butter business, in addition to ordinary farming operations, keeping a large number of cows, which renders a supply of pure water essential; that the water for the use of the stock is supplied by a stream which was pure and uncontaminated and without pollution of any kind, and that the milk and butter, from the cows which drank the water, was free from any objection or odor, and commanded the highest price on the market; that the defendant in error, the Prison Association of Virginia, became the owner of a certain tract of land upon said stream, above the land of the plaintiff, so that the water which passed through the plaintiff's land and was used by his stock and family, came through the defendant's land; that the defendant established upon his land a school for the confinement of youthful criminals, known as the "Laurel Industrial School," and erected thereon numerous buildings for their accommodation, and collected and quartered therein several hundred persons, and furnished the buildings with wash-tubs, bath-tubs, urinals and closets, without the consent of the plaintiff and against his protest, and emptied the refuse water, urine, and excrement therefrom into the

stream, and thereby polluted the natural and pure water of the stream on plaintiff's lands below, and, by reason thereof, broke up and destroyed his dairy business, seriously injured the health of his family, impaired the healthfulness of his home, and greatly lessened the value of his property in the public estimation, and reduced its salable value in the market.

The second count is substantially identical with the first, except that it charges the defendant with having erected wash-houses, urinals and closets, and constructed sewers from them to the stream where it passes through the defendant's lands, and by means of the said contrivances, the defendant emptied large quantities of impure water, urine, excrement and fecal matter, which mingled with the water therein, and by the natural flow of the stream polluted the water of the branch in and upon plaintiff's farm below, from which his stock and milch cows had to obtain their daily supply of water to satisfy the demands of nature.

The third count is to the same effect, with the additional allegation that, by reason of the impurities carried into it by means of the sewers erected by the defendant, not only was the water contaminated, but that the atmosphere about plaintiff's home became impregnated with microbes of typhoid fever and malaria, and was made in every way injurious to health; and in consequence thereof, the healthfulness of the plaintiff's farm was destroyed, and that of his family seriously impaired. By reason of the premises, plaintiff claims to have suffered damage to the extent of $2,000, for which he sues.

The defendant demurred to this declaration; the demurrer was sustained, the suit dismissed, and a writ of error was obtained from this court by the plaintiff.

The first objection interposed by defendant in error is that it is not liable to be sued for its torts, and in support of this proposition relies upon the recent case of *Maia's Admr* v. *Directors Eastern State Hospital*, 97 Va. 507. It was there held that,

"An examination of the statutes creating and continuing this hospital shows that it was created and exists for purely governmental purposes, and is under the exclusive ownership and control of the State. It has no stockholders, no members even, except directors, having no interest in it or its affairs, who are appointed by the Governor, by and with the consent of the Senate, and are in fact public, rather than corporate officials, endowed with a corporate being for a more convenient administration of the duties imposed upon them by law, and are made liable to fines for any failure to perform their duties.

" The moneys necessary to defray the expenses of maintaining and caring for its inmates is provided by annual appropriations made by the General Assembly out of the public treasury, and the manner of keeping and disbursing its funds is prescribed by statute. The directors are required to make quarterly reports to the Auditor of Public Accounts, showing in detail how they have been disbursed, and to report annually to the Governor, for the information of the General Assembly, the condition of the hospital and the sums received and disbursed by them."

The Prison Association is not such a corporation. It is a voluntary association of individuals, who procured a charter for certain specified objects. It is not controlled by the State, but by its own corporate officials. It makes and enforces its own by-laws and regulations for the management of its affairs and property. It is invested with all powers, rights, and privileges conferred, and made subject to all the responsibilities, regulations and restrictions imposed by the common law and the statutes of this Commonwealth upon corporate bodies. It may acquire and hold property, the value of the real estate held by it being limited to $100,000. Its general objects, it may be conceded, are of a benevolent character, as they look to the improvement of the government, discipline and general management of prisons within this State, and the amelioration of the

condition of prisoners, but for its services in this behalf, it receives a reasonable compensation; and, while its officers are required "to make an annual report of their work to the General Assembly of Virginia," that does not constitute it a public corporation, and give it immunity from responsibility for its torts.

In 1 Wood on Nuisances (3d ed.), section 427, it is said: "The right of a riparian owner to have the water of a stream come to him in its natural purity is as well recognized as the right to have it flow to his land in its usual flow and volume. But in reference to this, as with the air, it is not every interference with the water that imparts impurities thereto, that is actionable, but only such as impart to the water such impurities as substantially impair its value for the ordinary purposes of life, and render it measurably unfit for domestic purposes; or such as causes unwholesome or offensive vapors or odors to arise from the water, and thus impairs the comfortable or beneficial enjoyment of property in its vicinity, or such as, while producing no actual sensible effect upon the water, are yet of a character calculated to disgust the senses, such as the deposit of the carcasses of dead animals therein, or the erection of privies over a stream, or any other use calculated to produce nausea or disgust in those using the water for the ordinary purposes of life, or such as impair its value for manufacturing purposes."

The great principle upon which the law, as thus stated, rests is that every man must use his own property so as not to injure that of another. It is true, as urged by counsel for defendant in error, that the operation of this principle is qualified by another maxim founded in natural law, that he who exercises only his own legal rights injures no one. The motive, good or bad, which influenced the action complained of is generally of no importance whatever, for it is well stated by an eminent writer upon this subject that "whatever one has a right to do, another can have no right to complain of." Cooley on Torts, sec. 6, p.

630. If, therefore, a lawful act is done in a lawful manner, though another may be injured by it, the law affords no remedy. It is *damnum absque injuria.*

It was said by the court in *Merrifield* v. *Worcester*, 110 Mass. 219: " Cultivating and fertilizing the lands bordering on the stream, and in which are its sources, their occupation by farmhouses and other erections, will unavoidably cause impurities to be carried into the stream. As the lands are subdivided, and their occupation and use become multifarious, these causes will be rendered more operative, and their effects more perceptible. The water may thus be rendered unfit for many uses for which it had before been suitable; but so far as that condition results only from reasonable use of the stream in accordance with the common right, the lower riparian proprietor has no remedy.

" When the population becomes dense, and towns or villages gather along its banks, the stream naturally and necessarily suffers still greater deterioration. Roads and streets crossing it, or running by its side, with their gutters and sluices discharging into it their surface water collected from over large spaces, and carrying with it in suspension the loose and light material that is thus swept off, are abundant sources of impurity, against which the law affords no redress by action."

The wrong complained of in the declaration under consideration differs widely from that pollution of water incident to the causes adverted to in the foregoing quotation. Here it is charged not only that privies were erected for the accommodation of a great number of people, but also that the defendant "emptied refuse water, urine, and excrement therefrom, into the stream," and in other counts it is charged that this was done by means of sewers specially constructed for that purpose. Privies are *prima facie* nuisances, and " although necessary and indispensable in connection with the use of property for the ordinary purposes of habitation, yet if they are built, or are allowed to remain, in such a condition as to annoy others in the proper en-

joyment of their property  *   *   *   * they are nuisances, in fact, and render the person erecting or using them liable for all the injurious consequences flowing therefrom."

" The pollution of the water by artificial drainage which causes sewage to flow into a stream, spring, or well, whether done by a municipal corporation or an individual, constitutes a nuisance which entitles the owner to damages therefor, the rule being that a municipal corporation has no more right to injure the waters of a stream or the premises of an individual than a natural person." Wood on Nuisances, secs. 427 and 579.

In *Chapman* v. *City of Rochester*, 110 N. Y. 273, the defendant constructed certain sewers and through them discharged, not only surface water, but the sewage from houses, and the contents from a large number of water closets in Thomas creek, above plaintiff's land, so as to render its water unfit for use and covered its banks with filthy and unwholesome sediment. " These and other facts," said the court, " well warranted the conclusion of the trial court that the act of the defendant in thus emptying its sewers constituted an offensive and dangerous nuisance.  *   *   * The filth of the city does not flow naturally to the lands of the plaintiff, as surface water finds its level, but is carried thither by artificial arrangements prepared by the city, and for which it is responsible.  *   *   * The case comes within the general rule which gives to a person, injured by the pollution of air or water, to the use of which, in its natural condition, he is entitled, an action against the party, whether it be a natural person or a corporation, who causes that pollution."

The case of *Mayor of Baltimore* v. *The Warren Mfg. Co.*, 59 Md. 96, is instructive. The city of Baltimore asked an injunction against the defendants to restrain them from polluting Gunpowder river, the source of its supply of water for drinking and other purposes. The defendant was an upper riparian proprietor, and the charge against it was that it discharged, or

knowingly suffered or permitted to be discharged, into said stream, refuse water from its factory, impregnated with divers injurious ingredients and substances, put into the same by the defendant at its factory, whereby the water was rendered less pure and fit for use by man as drinking water. This charge was held to be too vague as to the nature and character of the defilement, but the additional charge that he erected, maintained and used divers large privies and hog-pens at or near said factory, the excrement and filth whereof the defendants caused, or wilfully suffered and permitted, to be discharged into the waters of Gunpowder river, whereby the water of the stream was greatly polluted, was held to be cause for the injunction.

Tracing the law from the time of Lord Coke to more recent times, the court, speaking through Judge Alvey, declares that "all common law authorities agree that a riparian owner has the right to the natural stream of water flowing by or through his land, in its ordinary, natural state, both as to its quantity and quality, as incident to the right to the land on or through which the water-course runs." * * * "If, therefore," said the court, "the defendants, being upper riparian proprietors, and as such entitled to the ordinary use of the water, including the right to apply it in a reasonable way to purposes of trade and manufacture, are using the water of the stream in an unreasonable manner, and have defiled the same in such manner and to such an extent as to operate an actual invasion of the rights of the complainants, the latter are entitled to redress by action at law, and, in case the nuisance be continued, to summary relief by injunction." * * * *

"What nature and extent of pollution of the stream will call for the active interference of the court is not in all cases easy to define. It is not every impurity imparted to the water, however small in degree, that will be the subject of an injunction. All running streams are, to a certain extent, polluted; and especially are they so when they flow through populous regions of

country, and the waters are utilized for mechanical and manufacturing purposes. The washing of the manured and cultivated fields, and the natural drainage of the country, of necessity bring many impurities to the stream; but these, and the like sources of pollution, cannot, ordinarily, be restrained by the court. Therefore, when we speak of the right of each riparian proprietor to have the water of a natural stream flow through his land in its natural purity, those descriptive terms must be understood in a comparative sense; as no proprietor does receive, nor can he reasonably expect to receive, the water in a state of entire purity. But any use that materially fouls and adulterates the water, or the deposit or discharge therein of any filthy or noxious substance, that so far affects the water as to impair its value for the ordinary purposes of life, will be deemed a violation of the rights of the lower riparian proprietor, and for which he will be entitled to redress. Anything that renders the water less wholesome than when in its ordinary natural state, or which renders it offensive to taste or smell, or that is naturally calculated to excite disgust in those using the water for the ordinary purposes of life, will constitute a nuisance, and for the restraint of which a court of equity will interpose."

The case before us measures fully up to the careful statement of the law in the opinion just quoted. If the averments of the declaration before us are true, the water is utterly unfit for its primary uses. It would be disgusting to the senses and injurious to the health. It is a matter of common knowledge that nothing is more susceptible to contaminating influences than milk, and its odor, its taste, and its wholesomeness are alike affected by the conditions to which it may be exposed. It is the principal food of the feeble and the young, and therefore to make and keep it pure and free from all contaminating influences is of great importance; but apart from the possible effect upon the health, who would not be nauseated at the idea that the milk he drinks was obtained from cows supplied with water from so foul a

source as described in this declaration? It does not set out one of those slight interferences the law passes over as too trifling to be considered, but a substantial, and indeed a destructive, impairment of the value of the water for all of its primary uses.

Defendant in error laid great stress upon the case of *Penn. Coal Co.* v. *Sanderson and Wife,* reported in 113 Penn. State Reports, p. 126. Its authority is much diminished by the fact that the Supreme Court of Pennsylvania, upon the same case, between the same parties, had reached an opposite conclusion in 86th volume of State Reports, page 401, and by the further fact, that in the last case three of the judges dissented, of a court of seven. That was a suit brought by Sanderson and wife against the Penn. Coal Company to recover damages for the pollution by the defendant of a stream of water which flowed through the plaintiff's grounds, by the discharge of water into it from the defendant's mines. The syllabus states, among other things, that " The use and enjoyment of a stream of pure water for domestic purposes by the lower riparian owners, who purchased their land, built their houses and laid out their grounds before the opening of the coal mine, the acidulated waters from which rendered the stream entirely useless for domestic purposes, must *ex necessitate* give way to the interests of the community, in order to permit the development of the natural resources of the country, and to make possible the prosecution of the lawful business of mining coal."

Whether the right of the individual, under like conditions, would with us yield to the public interest, except upon payment of proper compensation, is a question which we need not now decide.

That damages resulting to another, from the natural and lawful use of his land by the owner thereof, are, in the absence of malice or negligence, *damnum absque injuria,* as stated in that case, there can be no question, and there is great force in the position of the court that the defendant did nothing to change

the character of the water or diminish its purity, save what resulted from the natural use and enjoyment of its own property. Mining coal was a lawful business. It could not be carried on without freeing the mine from the water which percolated into it. All mine water is acidulated and unfit for domestic use. It was pumped out of the mine, and by the force of gravity, and the natural conformation of the land, it passed into and polluted the stream which flowed through the premises of the plaintiff. As was said by the court, "the defendants having brought nothing on to the land artificially; the water as it poured into Meadow Brook is the water which the mine naturally discharged. Its impurity arises from natural, not artificial causes. A mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharges are necessarily incident to it." It appears, moreover, "that the community in and around Scranton, including the complainant, is supplied with abundant pure water from other sources. There is no complaint as to any injurious effect from this water to the general health; the community does not complain on any grounds. The plaintiff's grievance is for a mere personal inconvenience, and we are of opinion that mere private personal inconvenience, arising in this way and under such circumstances, must yield to the necessities of a great public industry, which, although in the hands of a private corporation, subserves a great public interest. To encourage the development of the great natural resources of a country, trifling inconveniences to particular persons must sometimes give way to the necessities of a great community."

We have quoted thus fully from this case, not that we mean to approve, or that we presume to disapprove, the law as stated in that case, but merely to show that it has no very close analogy to the one before us.

The case of *Merrifield* v. *City of Worcester*, 110 Mass. 216, and that of *Morse* v. *City of Worcester*, 139 Mass. 389, were

suits against the city of Worcester for polluting a stream by emptying into it the sewerage of the city, and it was held that there can be no recovery against the city for the pollution, so far as it is attributable to the plan of sewerage adopted by the city, but only so far as it is attributable to the improper construction or unreasonable use of the sewers, or negligence or other fault of the city in the care or management of them.

Passages from the opinions in these two cases may be cited as antagonistic to the views hereinbefore expressed, but we think that the case of *Washburn* v. *City of Worcester*, 116 Mass. 458, will solve all the apparent difficulties which may be thus suggested. It there appears that the city of Worcester, in the construction of its water works, acted under a statute which made provision "for the assessment, under special proceedings, of damages to all parties whose estates are thereby injured," and the city was, of course, held not to be liable to an action at law or bill in equity for injuries which were the necessary results of the exercise of the powers thus conferred. Said the court: " But if by an excess of the powers granted, or negligence in the mode of carrying out the system legally adopted, or in omitting to take due precautions to guard against consequences of its operation, a nuisance is created, the city may be liable to indictment in behalf of the public, or to suit by individuals suffering special damage." So that these cases are in harmony with the entire current of authority.

We are of opinion that the judgment of the Circuit Court must be reversed.

*Reversed.*