# Wytheville.

## WESTON'S ADMINISTRATRIX V. HOSPITAL OF ST. VINCENT OF PAUL.

### June 23, 1921.

1. HOSPITALS AND ASYLUMS—*Charitable Institution—Case at Bar.*—A hospital operated by the Sisters of Charity of the Roman Catholic Church, who received no compensation for their services, which is not conducted for profit, has no stockholders, pays no dividends, whose income is received chiefly from pay patients and from donations and used for the support of the hospital, is a charitable institution.

2. CORPORATIONS—*Notice of Provisions of Charter by Persons Dealing with a Corporation—Charitable Institution.*—Every person who deals with a corporation is bound to take notice of the provisions of its charter for the management and control of its affairs. Therefore, the fact that a husband was ignorant of the charitable nature of a hospital when he engaged a room for his wife during her confinement is not of importance in determining the question of the hospital's liability for injuries to the newly born child.

3. HOSPITALS AND ASYLUMS—*Charitable Hospital's Exemption from Liability—Patient a New Born Baby.*—Where a husband engaged a room, board, nursing, etc., for his wife, a prospective mother, in a charitable hospital, and the latter voluntarily entered the hospital pursuant to such engagement, and submitted to its care and treatment, the parents assumed the risk as well for the child as for the mother.

4. NEGLIGENCE—*Assumption of Risk—Necessity of Contract.*—While assumption of risk is often a matter of implied contract, as in case of master and servant, it is not always and necessarily so. The mere doing of an act, in the absence of any contract, may be the assumption of risk, as is illustrated by engaging in athletic sports and the like.

5. HOSPITALS AND ASYLUMS—*Liability of Charity Hospital for Negligence of Physicians and Nurses.*—It seems to be well settled that a charity hospital, in the absence of a special contract to the contrary, is not liable for the negligence of its physicians

in the treatment of patients, and many of the cases apply the same rule to nurses.

6. CHARITIES—*Hospitals and Asylums—Liability of Charitable Institution for Negligence of its Servants—"Trust Fund Doctrine."*—The early cases advanced two antagonistic theories as to the liability of charitable institutions, privately conducted, for the negligent acts of its servants—one that the charity hospital is liable for the torts and negligence of its officers, trustees, agents, and servants; the other that the hospital is not liable for such torts and negligences. The latter is what is known as the "trust fund doctrine"—that is, that all funds donated to the charity are held in trust for the particular charitable purpose, and that it is a breach of trust to apply them to any other purpose; that the payment of damages due to the negligence of the servants of the institution is not a purpose contemplated by the trust, and for that reason the trust funds cannot be diverted for such payment.

7. CHARITIES—*Hospitals and Asylums—Liability of Charitable Institution for Negligence of its Servants—Virginia Doctrine.*— In the absence of statute, the liability of a charitable institution for its torts is based on public policy. The trust fund doctrine, as set out in the preceding syllabus, was founded on public policy, but goes too far in exempting the institution from liability for torts to third persons; but sound public policy forbids recovery to a beneficiary of the charity who has sustained injuries as the result of the torts of employees who were not at the time discharging corporate duties of the institution, when due care has been used in their selection and retention, and a pay patient is such a beneficiary.

8. HOSPITALS AND ASYLUMS—*Liability of Charity Hospital to Patients—Case at Bar.*—In the instant case a husband engaged a room in a charitable hospital for his wife as a pay patient, who expected shortly to be confined. The child, immediately upon birth, was delivered to the night nurse and died shortly afterwards from burns from a hot water bottle negligently applied by the nurse.

*Held:* That the duty owed by the hospital to decedent was the exercise of due care in the selection and retention of the nurse in charge of the patient; that negligence in respect of this duty has not been shown, and consequently no error was committed by the trial court in sustaining the defendant's demurrer to the evidence of the plaintiff.

Error to a judgment of the Circuit Court of the city of Norfolk in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Jas. G. Martin,* for the plaintiff in error.

*R. B. Spindle, Jr.,* and *Jas. E. Heath,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

Durant Weston engaged of the defendant in error a room, board and the usual hospital service for his wife, who was expecting shortly thereafter to be confined. She was to be a pay patient, but the price was not agreed on. He did not know that the hospital was a charitable institution. He provided his own doctor. Mrs. Weston went to the hospital at the appointed time, and on August 31, 1919, about 5:30 A. M., gave birth to a child. The child, immediately upon birth, was delivered to the night nurse on that hall, and was given the treatment usually given in such cases— that is, was placed in a basket on a sterile towel, with a little blanket folded over it, with a hot-water bottle next to these coverings. The towel and the blanket were between the baby and the hot-water bottle. When the baby was taken up at the usual time thereafter to be bathed and dressed, it was found to be so badly burned by the hot-water bottle that it died as the result of such burns in the course of a week. The nurse who attended the baby was one of the hospital nurses, who had been in training in the hospital for three years, had completed her training, had taken the State board examination as a practical nurse, and re-

ceived her graduation papers a few days after the accident. She was the night nurse in that ward on the night of the accident, and had been on duty since 7 P. M., her hours being from 7 P. M. to 7 A. M. The ward of which she had charge accommodated about fifteen patients, but it does not appear how many were in the ward at that time. The nurse testifies that the hot-water bottle used was taken from another patient; that it was tested as to temperature by putting it to the face, and that she did not think it was too hot. She further testifies that after putting the baby in the nursery with the hot-water bottle, she went about her other duties. While it is said that the hospital had graduate nurses on the hall for obstetrical cases, the attending nurse had received the training above mentioned and had served in the obstetrical ward for a few weeks during the month of November preceding the accident, and during the months of July and August immediately preceding the accident on August 31. Shortly after the death of the infant, Mrs. Weston qualified as the administratrix, and brought this action under the statute to recover damages for death by wrongful act or neglect. After all the evidence was in, the defendant demurred thereto and the trial court sustained the demurrer and entered judgment for the defendant. To that judgment, the writ of error in this case was awarded.

[1, 2] The defendant is a charitable institution, conducting a hospital solely for philanthropic and benevolent purposes. It is not conducted for profit, has no stockholders, and pays no dividends. All of its income is used for the support of the hospital, which is not self-sustaining. It is a "charitable institution for the care of the sick and the poor," and is operated by the Sisters of Charity of the Roman Catholic Church, who receive no compensation for their services. It receives its income chiefly from pay patients and from donations.

In *Hospital of St. Vincent of Paul* v. *Thompson,* 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025, it was determined, upon substantially the same evidence now before us, that the defendant was a charitable institution, and we do not attach serious importance to the objection that the father of the child was ignorant of the charitable nature of the institution when he engaged the room for his wife. *Stewart* v. *California, etc., Ass'n,* 178 Cal. 418, 176 Pac. 46, 48. Every person who deals with a corporation is bound to take notice of the provisions of its charter for the management and control of its affairs. *Relfe* v. *Rundle,* 103 U. S. 222, 226, 26 L. Ed. 337.

The evidence in the instant case does not warrant the inference that there was any negligence in the selection of the nurse whose negligence caused the injury complained of, as contended by counsel for the plaintiff in error, and the case does not present any question of a violation of a corporate or non-assignable duty.

[3, 4] Counsel for the plaintiff in error earnestly insists that: "Even if charities are ordinarily exempt from injuries to patients, the *exemption is based on contract,* and has no application to a new-born babe, *who could not contract* and who had no *voluntary* thought in selecting a charity hospital to be born in, *and our statute for death allows recovery wherever the deceased could recover if alive.* (Code, section 5787.)"

This court did not hold, nor did Judge Keith say, in the case of *Hospital* v. *Thompson,* 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025, that charities "are subject to the general laws of the land, and cannot therefore claim exemption from responsibility for torts of their agents, unless that claim is based on a *contract* with the person injured." The language quoted is the language of the Supreme Court of Michigan, in *Bruce* v. *Central M. E. Church,*

147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150, in its effort to reconcile that case with *Downes* v. *Harper Hospital,* 101 Mich. 555, 60 N. W. 42, 25 L. R. A. 602, 45 Am. St. Rep. 427, and in explanation of the holding in *Powers* v. *Mass. Hospital,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372. No such question was involved in *Hospital* v. *Thompson, supra.* The question there involved was the liability of the hospital to a *third person,* not a beneficiary, and the quotation is made in connection with a discussion of cases showing that the "trust fund" doctrine does not apply to injuries to third persons. All that is said as to liability to beneficiaries of the charity was confessedly obiter, but if any deduction is to be made as to the position of this court on the subject of liability to beneficiaries, it is that it approved the holding in the *Powers Case.* Furthermore, it is hereinafter pointed out that the Michigan court misinterpreted the holding in the *Powers Case.*

The father of the child engaged the room, board, nursing, etc., for the prospective mother, and the latter voluntarily entered the hospital pursuant to such engagement and submitted to its care and treatment, and they thereby assumed the risk as well for the child as the mother. Parents have and exercise such authority of necessity over their children of tender years. It is not only the right, but the duty, of parents to provide for the proper care and nursing of their very young children, and if need be to provide for surgical operations upon them, or hospital treatment, or both. In these matters the wishes of young children are not consulted, nor their consent asked when they are old enough to give expression thereto. The will of the parents is controlling. In the case at bar, if the action of the parents was an assumption of risk on the part of the mother, it was on behalf of the child also, and they

had the power to make it. While assumption of risk is often a matter of implied contract, as in case of master and servant, it is not always and necessarily so. The mere doing of an act, in the absence of any contract, may be the assumption of risk, as is illustrated by engaging in athletic sports and the like. A man who crosses a railroad track in front of an approaching train assumes the risk of getting across in safety. We assume risks in many ways every day, without any relation to contract.

[5] This brings us to the consideration of that difficult question, so much discussed and upon which so much has been written, the liability of charitable hospitals for negligent injuries inflicted by their servants.

[6] The early cases advanced two antagonistic theories as to the liability of charitable institutions, privately conducted, for the negligent acts of its servants—one, that the charity hospital is liable for the torts and negligence of its officers, trustees, agents and servants; the other, that the hospital is not liable for such torts and negligences. The latter is what is known as the "trust fund doctrine"— that is, that all funds donated to the charity are held in trust for the particular charitable purpose and that it is a breach of trust to apply them to any other purpose; that the payment of damages due to the negligence of the servants of the institution is not a purpose contemplated by the trust, and for that reason the trust funds cannot be diverted for such payment.

The theory making charitable institutions liable for acts and neglects of its servants, and placing them in this respect on much the same footing as business corporations, first found expression in this country in *Glavin* v. *Rhode Island Hospital*, 12 R. I. 1, 34 Am. Rep. 675, decided in 1879. The decision, however, did not meet the approval of other States, and was not followed by them, and was

38

subsequently overruled by an act of the legislature of Rhode Island, declaring that "no hospital incorporated by the General Assembly of this State, sustained in whole or in part by charitable contributions or endowments, shall· be liable for the neglect, carelessness, want of skill, or for the malicious acts of. any of its officers, agents or employees in the management of, or for the care or treatment of, any of the patients or inmates of such hospital." General Laws R. I. 1896, p. 538. It will be observed that the act was restricted to "patients or inmates of such hospital." In the more recent case of *Basabo* v. *Salvation Army,* 35 R. I. 22, 85 Atl. 120, 42 L. R. A. (N. S.) 1144, decided in 1912, the Rhode Island court, in a very able opinion, reviewing a large number of cases *pro* and *con,* adheres to its opinion in the *Glavin Case,* in so far as it has not been changed by statute, and sets forth more fully and clearly the facts and the reasons for the holding in the *Glavin Case.* In the *Basabo Case,* the defendant was held liable for the death of a third person, not a patient or inmate of the hospital, occasioned by the negligent driving of defendant's servant, though carefully selected in the first instance. We do not find that the *Glavin Case* has elsewhere found approval until 1915, when it was approved by the Supreme Court of Alabama in *Tucker* v. *Mobile Infirmary Association,* 191 Ala. 572, 68 So. 4, L. R. A. 1915-D 1167, where recovery was allowed a pay patient in a charity hospital for negligent scalding by a nurse in the hospital. The majority opinion reviews a large number of the cases on the subject and arrives at the conclusion that the exemption of the hospital from liability cannot be reasonably based on the "trust fund doctrine," the inapplicability of the *respondeat* superior doctrine, the implied assent, or assumption of risk theory, nor upon any other ground stated by other courts. It regards the "implied assent" theory as

the one "upon which the more recent and best-considered cases seem to rest." On this subject, it holds that: "A hospital treating indigent patients freely, and requiring and receiving pay from patients able to pay, which had issued no stock and had no stockholders, which was not operated for profit, and which used the money so received in the operation and extension of its hospital work, and exercised due care in the selection and retention of a nurse and as to her competency, and did not know of her incompetency, if any, was not exempt from liability for damages to a patient received for a reasonable compensation for a surgical operation, and who, after the operation, was scalded internally and externally by reason of the negligence of a nurse; the patient in such case not impliedly assenting to and assuming the risk of such negligent injury, nor waiving the corporation's liability therefor." 191 Ala. 572, syl. 4, 68 So. 4, syl. 4, L. R. A. 1915D 1167.

The court freely concedes that the great weight of authority in this country is against its conclusion, and, continuing, says: "This, within itself, is, of course, of much force, and has led us to a very careful review of the cases, and a consideration of the principles upon which they may be said to rest. But it sometimes happens that in order to reach a safe harbor one must row against the current. We have here endeavored to show that the theory upon which those cases are founded does not measure with the rule of reason or sound logic, as we view it. While many of them reach the same end, yet they do so by entirely divergent routes and upon theories entirely inconsistent one with the other. For these courts we have the highest respect, but we cannot follow in their wake."

The theory upon which this decision is rested is most strongly expressed in the following extract from the majority opinion:

"The complaint alleges that the plaintiff agreed to pay a reasonable compensation; that is, such sum as is reasonable to be paid for the services rendered. She has depended upon no charity, she sought none, but was to pay a reasonable price for what she received. Had she been a dependent upon another's bounty, either to a great or small degree, there might be some plausibility in the argument that it would not lie in her mouth to say that the institution should be held to strict accountability for the negligent act of its servants, in administering the charity which she herself has sought. We are unable to conceive upon what principle the theory of 'implied assent' could be applied to one who pays full price and without regard to the nature of the institution from which she receives her service. There can be no valid reason why such a patient, dealing as she does at arm's length with the hospital, should not stand in as favorable a position as the stranger, and yet many of the cases grant relief to the latter and deny it to the former.

"The principle, if held to be sound, must rest upon the fact that it is the giving and receiving of charity that creates the exemption, and not the nature of the institution administering it."

The opinion then proceeds to "make it clear" that the court is not expressing any opinion as to the position of one who in fact accepts a charity, but as to such person it says, "Sufficient unto the day is the evil thereof." The opinion fails to take cognizance of what the charity consists of which the patient partakes, for what the hospital holds itself out to the public, and for what the patient pays. The public charity which the patient pays for the privilege of enjoying is the hospital building, with all of its equipment and management, the care and nursing, and the rules and regulations under which it is operated, whereby it is

kept sanitary and is made comfortable. All of these are provided by charity before the patient applies for admission, and he pays for the privilege of enjoying them as he finds them, and his payments go to the further maintenance of the charity of which others coming after him are to enjoy the benefits. He is receiving the benefits which charity has provided. In this sense, he is a charity patient. It is true that he is paying for the privilege he enjoys, and this may entitle him to greater luxuries which his money can supply, but not to any greater care or freedom from negligence on the part of the attendants. The rich and the indigent stand on the same footing as to protection against such negligence. As said in *Powers* v. *Mass. Homeopathic Hospital,* 109 Fed. 294, 295, 47 C. C. A. 122, 123 (65 L. R. A. 372) : "A paying patient in the defendant hospital, as well as a non-paying patient, seeks and receives the services of a public charity. That such a hospital in its treatment of a rich patient shall be held to a greater degree of care than in its treatment of a pauper, is not to be tolerated. Certain luxuries may be given the former which the latter does not get, and this for various reasons; but the degree of protection from unskilled and careless nurses must be the same in both cases."

The hospital undertakes to use care in the selection and retention of its nurses, and holds itself out to the public as offering its comforts and its facilities, just as they are, and subject to all of its rules and regulations, with the implied assurance that it has exercised due care in the selection and retention of its servants, and in the management and conduct of its internal affairs, and those who enter its walls as patients, whether for pay or without pay, must be deemed to have assented to these conditions. The hospital has a right to do this, and "whatever one has the right to do, another can have no right to complain of." Cooley

on Torts, sec. 6, p. 630. If a lawful act is done in a lawful manner and damage results to another therefrom, it is *damnum absque injuria*. The best interest of society does not demand of a charitable institution offering its ministrations to the destitute sick anything more in respect to its nurses than that it shall exercise ordinary care in their selection and retention. Even in the case of master and servant, where the master is getting the benefit of the services of his servant, all that is required of the master in relation to the instrumentalities which the servant is to use, is that he shall use ordinary care to provide instrumentalities that are reasonably safe for the servant's use.

The case of *Mulliner* v. *Evangelisher*, 144 Minn. 392, 175 N. W. 699, relied on by counsel for the plaintiff in error in his reply brief, adds nothing new, either by way of reason or authority, to the able opinion of the Alabama court in the *Tucker Case*. The only new cases added which are supposed to support the *Glavin Case* of Rhode Island are *Gilbert* v. *Corporation of Trinity House*, 17 Q. B. Div. (1886) 795, where the defendant was not a charitable institution and the injury sued for was a "claim for damages in respect of injuries to the plaintiff's vessel and cargo," and *University of Louisville* v. *Hammock*, 127 Ky. 564, 106 S. W. 219, 14 L. R. A. (N. S.) 784, 128 Am. St. Rep. 355, in which it was held that the defendant was an institution conducted for profit, and not a charitable institution, although it did a great deal of charitable work. These cases need no discussion.

The second, or "trust fund" theory is held, more or less, in its integrity, in Illinois, Kentucky, Maine, Maryland, Missouri, Nebraska, Pennsylvania, Tennessee and other States. *Parks* v. *Northeastern University*, 218 Ill. 381, 75 N. E. 991, 2 L. R. A. (N. S.) 556, 4 Ann. Cas. 103; *Cook* v. *Norton Infirmary*, 180 Ky. 331, 202 S. W. 874, L. R. A.

1918-E 647; *Jensen* v. *Infirmary,* 107 Me. 408, 78 Atl. 898, 33 L. R. A. (N. S.) 141; *Perry* v. *House of Refuge,* 63 Md. 20, 52 Am. Rep. 495; *Adams* v. *University Hospital,* 122 Mo. App. 675, 99 S. W. 453; *Duncan* v. *Nebraska Sanitarium,* 92 Neb. 162, 137 N. W. 1120, 41 L. R. A. (N. S.) 973, Ann. Cas. 1913-E 1127; *Fire Ins. Patrol* v. *Boyd,* 120 Pa. 624, 15 Atl. 553, 1 L. R. A. 417, 6 Am. St. Rep. 745; *Gable* v. *Sisters of St. Francis,* 227 Pa. 254, 75 Atl. 1087, 136 Am. St. Rep. 879; *Abston* v. *Waldon Academy,* 118 Tenn. 24, 102 S. W. 351, 11 L. R. A. (N. S.) 1179; *Downes* v. *Harper Hospital,* 101 Mich. 555, 60 N. W. 42, 25 L. R. A. 602, 45 Am. St. Rep. 417; *Fordyce* v. *Woman's, etc., Association,* 79 Ark. 550, 96 S. W. 155, 7 L. R. A. (N. S.) 485. The earliest, or certainly one of the earliest cases we have in this country on this subject is *McDonald* v. *Mass. Gen'l Hospital,* 120 Mass. 432, 21 Am. Rep. 529, which was rested in part at least on the "trust fund" doctrine; and so also was *Downes* v. *Harper Hospital,* 101 Mich. 555, 60 N. W. 42, 25 L. R. A. 602, 45 Am. St. Rep. 427, notwithstanding the explanation given of it in the subsequent case of *Bruce* v. *Central M. E. Church,* 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150. Even the *Glavin Case,* which repudiates the trust fund doctrine, goes so far as to say: "It may be that some of the corporate property, the buildings and grounds, for example, is subject to so strict a dedication that it cannot be diverted to the payment of damages." It is rather difficult to understand where both real and personal property are held under the same trust, how the one can be taken and the other not. The buildings and grounds of a hospital would be of little value to the charity without the equipment.

Much of what is said in some of the cases on the "trust fund" doctrine, could be more appropriately applied to the rule of public policy of which more will be said later. In-

deed, the trust fund doctrine is simply a rule of public policy. The rule of public policy by which, under the name of "trust fund," the funds of charitable institutions were held absolutely inviolate for any purpose has been regarded by many courts as extending the rule of public policy too far, and this court, after a careful review and consideration of the cases on the subject, refused to apply it in *Hospital* v. *Thompson*, 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025, where an invitee of a hospital was allowed to recover for a personal injury received as the result of the faulty condition of the defendant's elevator. These courts, under the title of "assumption of risk waiver, release, implied assent, or other designation have restricted the application of public policy to cases of beneficiaries of the charity who have suffered damages from negligence of employees of the charity attending them. Forcible reasons are assigned for the restriction. In *Hospital* v. *Thompson*, *supra*, it is said: "The trust fund doctrine would establish absolute immunity for all torts committed by such associations. It would apply to the omission to perform, or the negligent performance of non-assignable duties and indeed to negligence in all its conceivable forms. The immunity flowing from the acceptance of the benefits of such a charity, as held by the decisions of many courts, rests upon a more logical foundation, and has met with approval of many courts of high standing, and the trend of modern decisions seems to be in that direction." It is said further in some of the cases that the absolute inviolability of trust funds would permit the institution to violate its contracts with impunity, to commit torts on third persons, to create or permit nuisances on its property, to be indifferent in the selection and retention of its employees, and to place the institution beyond the pale of the law; that the rights of third persons "are those created by general laws, and

the duties of those administering the trust to respect those rights are also created by general laws," and that "the doctrine that the will of an individual shall exempt either persons or property from the operation of general laws is inconsistent with the fundamental idea of government. It permits the will of the subject to nullify the will of the people." *Bruce* v. *Central M. E. Church*, 147 Mich. 230, 110 N. W. 953, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150. See also *Powers* v. *Mass. H. Hospital, supra; Basabo* v. *Salvation Army, supra*. For these, or like reasons, many courts have refused to adopt the "trust fund" doctrine in its entirety, and have limited the application of the rule of public policy, as aforesaid.

In *Trevett* v. *Prison Association*, 98 Va. 332, 36 S. E. 373, 50 L. R. A. 564, 81 Am. St. Rep. 727, an action for damages was allowed for fouling a stream of water to the detriment of a lower proprietor, although it was conceded that the defendant was a corporation of benevolent character doing a valuable work for the benefit of the State; and in *Hospital* v. *Thompson, supra*, recovery was allowed against the plaintiff in error in favor of an invitee injured in consequence of the unsafe condition of an elevator in its hospital. It was the necessity for the redress of wrongs of the nature of those mentioned that led many courts to restrict the exemption extended to charitable institutions. That they should be exempt from liability to those who accept their benefits appears to be the opinion of nearly all the courts of this country to which the question has been propounded, though they differ as to the reasoning by which the conclusion has been reached.

The States and the municipalities maintain hospitals for the insane, for the deaf, dumb and blind, for the treatment and care of tuberculosis and many other diseases, for the treatment of the sick, and for surgical operations on those

in need of it.  All of these are charitable institutions established for the public good, operated by public functionaries, at public expense, but for reasons of public policy no suit can be maintained against any of them to recover damages for the act or neglect of any agent, servant or other person connected therewith, and no serious inconvenience has resulted therefrom.  We have a number of cases in this State announcing the doctrine.  *City of Richmond* v. *Long,* 17 Gratt. (58 Va.) 375, 94 Am. Dec. 461; *Maia* v. *Eastern State Hospital,* 97 Va. 507, 34 S. E. 617, 47 L. R. A. 577; *Fry* v. *Albemarle Co.,* 86 Va. 195, 98 S. E. 1004, 19 Am. St. Rep. 879.  That these great public charities should be maintained for the public good cannot be questioned, and if as a result an individual injury is sometimes suffered, it is equally plain that it is better that the individual should suffer than that the public charity should not be carried on. Now, public charities, privately conducted from mere benevolence, are great adjuncts to such charities conducted by the State or municipality, and are great favorites with the courts, and while it may not be safe or desirable to place them above the law, it is manifestly desirable that they should be encouraged in their good work, and to this end protected so far as it is consistent with public safety and the public good from pecuniary liability to those who accept their benefits.  Such is the conclusion of a great majority of the courts of this country, though founded on a diversity of reasoning, and we have the assurance of the wisest of men that "in the multitude of counsellors there is safety."

One of the best-considered cases we have on the subject, and one that is often cited as a leading case, is *Powers* v. *Mass. Homeopathic Hospital,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372, decided by the United States Circuit Court of Appeals, First Circuit, in 1901.  There, recovery

was denied to a pay patient in a charity hospital for the negligence of a nurse in burning the patient with a hot-water bag. The case, in many of its aspects, is similar to the case at bar. It was there said: "That the defendant is a charitable corporation admits of no doubt. This was expressly recognized by the legislature of Massachusetts in chapter 358 of the Acts of 1890, and was decided in *Mc-Donald* v. *Massachusetts General Hospital*, 120 Mass. 432, 21 Am. Rep. 529." We may say the same of the hospital here. It was recognized by an act of the legislature passed January 20, 1860, declaring it to be "altogether charitable and praiseworthy," and was decided so to be in *Hospital* v. *Thompson*, 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025.

A distinction was sought to be made there, as here, between a pay patient and one who paid nothing. Upon that subject the court said:

"The plaintiff was what is sometimes called a 'paying patient,' the rate of her payment being $14 a week. Upon this ground, her counsel has sought to distinguish her case from that of a patient in the hospital who pays nothing. In our opinion, the difference is immaterial. As has been said, the defendant was a charitable corporation; that is, a corporation organized exclusively for charity. That the ministrations of such a hospital should be confined exclusively to the indigent is not usual or desirable. Those of moderate means from necessity, and not a few rich people from choice, resort to great charitable hospitals for treatment, especially in surgical cases. Throughout the world this is the custom in these institutions, whether they are maintained by individual, religious, or municipal charity. From patients who are not indigent, a payment is commonly permitted or required. Commonly, and in the case at bar quite manifestly, this payment does not make full

pecuniary compensation for the services rendered. Those who make a considerable payment not infrequently receive in some respects a more expensive service than do those who make a small payment or none at all; but the payment required is usually calculated upon the patient's ability to pay, rather than upon the whole cost of the treatment he receives. That this was the defendant's rule, appears plainly from its printed form of application, which it required all applicants to fill out alike, whether they paid something or nothing. In this form the inquiry concerning payment was stated as follows: 'How much per week applicant can pay'—thus indicating that the amount of the contribution was to be determined not by the value or cost of the service rendered, but by the ability of the patient to aid the charitable purposes of the hospital. In our opinion, a paying patient seeks and receives the services of a public charity.

"That such a hospital, in its treatment of a rich patient, shall be held to a greater degree of care than in its treatment of a pauper is not to be tolerated. Certain luxuries may be given the former which the latter does not get, and this for various reasons; but the degree of protection from unskilled and careless nurses must be the same in both cases."

The learned judge who delivered the opinion of the court considered very carefully a number of the cases bearing on the subject, including English cases and the *Glavin Case,* from Rhode Island, and announced the following as the conclusion of the court:

"One who accepts the benefit either of a public or a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To para-

phrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. Were the heart and means of that Samaritan so large that he was able, not only to provide for one wounded man, but to establish a hospital for the care of a thousand, it would be no less intolerable that he should be held personally liable for the negligence of his servant in caring for any one of those thousand wounded men.

"We cannot perceive that the position of the defendant differs from the case supposed. The persons whose money has established this hospital are good Samaritans, perhaps giving less of personal devotion than did he, but, by combining their liberality, thus enabled to deal with suffering on a larger scale. If, in their dealings with their property appropriated to charity, they create a nuisance by themselves or their servants, if they dig pitfalls in their grounds and the like, there are strong reasons for holding them liable to outsiders, like any other individual or corporation. The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risks of malpractice, if their charitable agents have been carefully selected.

"We have thus indicated the grounds upon which rests, in our opinion, the defendant's exemption from liability in this case. Though we feel constrained to differ from the reasoning followed by some other courts in reaching the same conclusion, we are not unmindful that the identity of conclusion reached, though by different roads, is a strong proof of its correctness. Doubtless, a weight of authority is more overwhelming if it is identical in reasoning as well as in result, but identity of result is in itself no mean argument for its justice."

It will be observed that words "public policy" are not used in the opinion, but the words used have the same meaning—"one who accepts the benefit" of the charity, "if a suffering man avails himself of their charity," it "would be intolerable" to permit him to recover for the negligence of their servants, if due care was used in their selection.

This holding has generally been followed by the courts before which the question has since come, unless controlled by prior decisions in their own jurisdiction. In *Bruce* v. *Central M. E. Church, supra,* the *Powers Case* is referred to in the following language:

"In the latest of these cases (*Powers* v. *Homeopathic Hospital*), the opinion is exhaustive and elaborate, and discusses nearly all the authorities. It is held that the ground upon which liability is denied is that of assumed risk, the court saying: 'One who accepts the benefit either of a public or of a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting these servants.' The ground upon which liability is denied in nearly all the foregoing cases is that stated in the *Downes Case,* viz: that it would thwart the purpose of the trust; that is, it would oppose the will of the founder of the trust to pay from trust funds damages caused by an agent's torts. It is entirely logical to say that this will must be recognized by beneficiaries of the trust. It may justly be said that the benefit of the trust is extended to them and accepted by them upon the implied condition that they shall recognize that will. By becoming beneficiaries, they agree to recognize it."

After discussing the various theories of exemption, and the examination of the cases, English and American, the opinion continues:

"I conclude from this reasoning that corporations administering a charitable trust, like all other corporations, are subject to the general laws of the land, and cannot, therefore, claim exemption from responsibility for the torts of their agents, unless that claim is based on a contract with the person injured by such a tort, and that *Downes* v. *Harper Hospital* and other similar cases are consistent with this rule. They rest upon the principle correctly stated in *Powers* v. *Mass. Homeopathic Hospital, supra,* viz: that the beneficiary of such charitable trust enters into a contract whereby he assumes the risk of such torts. It is not surprising that years should have elapsed before the correct legal principle governing these cases was announced in *Powers v. Mass. Homeopathic Hospital.* The discovery of correct legal principles, like the discovery of scientific and social truths, requires time and patient investigation."

An examination of the opinion in the *Powers Case* will show that it is not placed on the ground that the patient contracted to assume the risk, but rather on the ground that he "enters into a relation which exempts his benefactor from liability." He assumes the risk by virtue of entering the hospital and submitting to its treatment, not by virtue of any contract. If the exemption were dependent on contract, then there could be no exemption where the patient was an infant or unconscious, or for any other reason incapable of entering into a contract, and we would have one rule applicable to this class of persons and a different one applicable to others, although all were subjected to the same treatment. The true theory of the *Powers Case* is that the exemption is based on public policy, and it was so regarded in the *Basabo Case,* as is pointed out in *Hospital* v. *Thompson,* 116 Va. 114, 81 S. E. 13, 51 L. R. A. (N. S.) 1025. Furthermore, the statement of the Michigan court was *obiter.* The court was then dealing with the case

of an injury to a third person, and not to a patient in the hospital.

The doctrine of the *Powers Case* was fully approved in *Hordern* v. *Salvation Army,* 199 N. Y. 233, 92 N. E. 626, 32 L. R. A. (N. S.) 62, 139 Am. St. Rep. 889. After making the quotations above from the *Powers* and *Bruce Cases,* Cullen, C. J., speaking for the court, says: "We can add nothing to the force of this reasoning, but simply express our concurrence therein, as well as in the argument of Judge Powell" in the *Powers Case.*

In *Farrigan* v. *Pevear,* 193 Mass. 147, 78 N. E. 855, 7 L. R. A. (N. S.) 481, 118 Am. St. Rep. 484, 8 Ann. Cas. 1109, it was held that the duty of trustees exercising charitable functions does "not extend beyond the requirement of using reasonable care to select competent servants, and the demands of substantial justice are met if, as charitable trustees, they are not charged with the negligence of those so employed." In *Cunningham* v. *Sheltering Arms,* 135 App. Div. 178 (1909), 119 N. Y. Supp. 1033, it was held that a charitable institution from which the directors and organizers receive no profit is not liable for injuries to a child placed therein by its mother who contributed to the expense of caring for him, caused by the negligence of one employed in furtherance of the charitable object, if due care was used in selecting the employee.

In *Lindler* v. *Columbia Hospital,* 98 S. C. 25, 81 S. E. 512, a patient in a hospital, while unconscious, was burned by hot-water bottles placed in the bed with her by negligence of a hospital nurse, and it was held in the majority opinion to be contrary to public policy to hold the hospital liable for the resulting injury when it had used due care in the selection of the nurse.

In *Hoke* v. *Glenn,* 167 N. C. 594, 83 S. E. 807, Ann. Cas. 1916-E 250, it was held that the extent of liability of chari-

table institutions for the acts and omissions of its servants is due care in their selection and retention.  The court said:

"The Supreme Court of Rhode Island, in a very able and learned opinion in *Basabo* v. *Salvation Army*, 35 R. I. 22, 85 Atl. 123, 42 L. R. A. (N. S.) 1144, holds that a charitable institution is liable for the negligence of its employees, but the party injured in that case was not a patient, and the Supreme Court of Missouri, in an opinion equally strong and persuasive, in *Adams* v. *University*, 122 Mo. App. 675, 99 S. W. 453, absolves such an institution from all liability from negligence, whether the result of the acts of its employees or of failure to exercise due care in their selection.

"We prefer to adopt the middle course, which exempts from liability for the negligence of employees and requires the exercise of ordinary care in selecting them, as more consonant with authority and with the purposes for which such institutions are established.

"The beneficiaries of charitable institutions are the poor, who have very little opportunity for selection, and it is the purpose of the founders to give to them skillful and humane treatment.  If they are permitted to employ those who are incompetent and unskilled, funds bestowed for beneficence are diverted from their true purpose, and, under the form of a charity, they become a menace to those for whose benefit they are established.

"It is, therefore, better for those committed to their care and for the institutions, and necessary to effectuate the purpose of their creation, to require the exercise of ordinary care in selecting employees, and in supervising them."

[7] The prevailing opinion in this country is that in a case like the one under consideration the hospital is not liable, and while different reasons have been assigned for the exemption, we believe that the correct basis of the exemption is public policy, and this we conceive to be in effect

the holding in the *Powers Case.* For the reasons hereinbefore stated, we limit the application of public policy to beneficiaries of the charity, who have sustained injuries of the character herein complained of, and in their behalf hold that due care shall be exercised by the institution in the selection and retention of their employees. In the class of beneficiaries we include as well those who pay for the service as those who do not. As to the respective rights of charitable institutions and third persons, we adhere to our holding in *Hospital* v. *Thompson, supra.* We express no opinion on any other question.

The question of liability of charitable institutions for the torts of its employees and the extent of that liability, if any, is at last a question of public policy, the determination of which the courts cannot escape in the absence of legislation on the subject. The determination of a number of courts of the highest respectability that there should be absolute immunity in all cases, and which came to be known as the "trust fund theory," was nothing more than saying that the immunity was granted from reasons of public policy, that, on the whole, the public would be best served by the application of this theory. After a careful examination and consideration of the whole subject, and a review of the principal cases, other courts of at least equal ability came to the conclusion that the rule of public policy had been extended too far, and that it should be restricted in its application to beneficiaries of the charity who sustained injuries as the result of torts of employees who were not at the time discharging corporate duties of the organization, and in the latter view this court concurs.

We have not referred to certain rather old English cases that are supposed to bear upon the questions here under consideration because they have been fully considered in the American cases referred to, especially the *Glavin, Hearns* and *Powers Cases.*

There are also quite a number of cases in this State and other States involving the right to sue one exercising governmental powers, and cases in other States on the liability of charitable institutions for negligent injuries to third persons,. many of which are not referred to because those questions are not involved in this case. Many of them are referred to in *Hospital* v. *Thompson, supra,* where the latter question was involved. It has also been impracticable to refer to all of the cases that are either directly in point or throw light on the subject, but the following references in addition to those in the cases cited will furnish an adequate list of cases to those who wish to pursue the inquiry further: 19 Mich. Law Review 395 (Feby. 1921); Notes to *Hordern* v. *Salvation Army*, 139 Am. St. Rep. 893; Notes to *Parks* v. *Northwestern University*, 4 Ann. Cas. 105; Notes to *Duncan* v. *Hospital*, Ann. Cas. 1913E 1129, 52 L. R. A. (N. S.) 505. The liability of railroad, mining and other corporations for the malpractice or other negligence of physicians and surgeons employed by them to attend sick and injured employees is sufficiently considered and discussed in *Big Stone Gap Iron Co.* v. *Ketron*, 102 Va. 23, 45 S. E. 740, 102 Am. St. Rep. 839; *Virginia I. C. & C. Co.* v. *Odle*, 128 Va. 280, 105 S. E. 107; and *Powers* v. *Mass. Homeopathic Hospital*, 109 Fed. 298, 47 C. C. A. 122, 65 L. R. A. 372.

[8] Upon the authorities cited, and upon principle, we are of opinion that the duty which the defendant in error owed to the decedent was the exercise of due care in the selection and retention of the nurse in charge of the patient; that negligence in respect of this duty has not been shown, and consequently no error was committed by the trial court in sustaining the defendant's demurrer to the evidence of the plaintiff. The judgment of the trial court will, therefore, be affirmed.

*Affirmed.*

SIMS, J., dissenting:

I find myself unable to concur in the conclusion of the majority opinion in this case.

It is true that while the law of torts was being developed the doctrine that a charitable corporation is not liable for injuries resulting from the negligent or tortious acts of ministerial servants in the course of their employment, where the corporation has exercised due care in their selection, became very generally established by the decisions in most jurisdictions. But it seems now very clear that this doctrine cannot be sustained on principle, except in those cases in which the actual tender of service—the actual undertaking—on the part of the corporation is of a qualified or limited character of service, and such qualified tender of service is accepted by the person complaining, as, for example, when a hospital does not undertake to do anything more for its patients than to use due care in the selection of its servants who may have the care of the patients.

The opinion of the district court in the case of *Powers* v. *Massachusetts Homeopathic Hospital,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372, chiefly relied on in the majority opinion, is a well reasoned opinion until it comes to the ground on which the decision is placed, namely, that if a suffering man avails himself of gratuitous services, as of a charity embodied in a charity hospital, he takes the risk of malpractice, if the agents of the hospital have been carefully selected. Such a conclusion, thus broadly stated, seems to be a palpable departure from principle. It rests upon the position that no duty exists on the part of the hospital to perform the service of proper ministerial care of and attention to its patients if that service is gratuitously undertaken by the hospital. The fallacy of that position was

established as early as the case of *Coggs* v. *Barnard*, 1 Smith's Lead. Cas. 95, as is pointed out in the concurring opinion of Judge Potter in *Glavin* v. *Rhode Island Hospital*, 12 R. I. 411, at p. 434, 34 Am. Rep. 675, at p. 689. As there said: "It is enough that confidence is tendered and accepted. That is a sufficient consideration; and the fact that the service is rendered gratuitously is immaterial. 'The confidence induced by undertaking any service for another is a sufficient legal consideration to create a duty in the performance of it,' said Grier, J., citing *Coggs* v. *Bernard*, and 1 Smith's Lead. Cas. 95; *Philadelphia & Reading Railroad* v. *Derby*, 14 How. 468, 485; Whart. on Neg. §§ 437, 640, 641. The remarks of the last-cited author in section 437 and the authorities there cited apply. If a person undertakes to do an act or discharges a duty by which the conduct of others may properly be governed, he is bound to do it in such a manner that those who act upon the faith of it shall not suffer from his negligence; and this even if there was, in the beginning, no consideration for the promise."

As said in the opinion of the court in *Gilbert* v. *Corporation of Trinity House*, 17 Q. B. Div. L. R. 795, at p. 799: "The law is plain that whoever undertakes the performance of, or is bound to perform, duties * * however they may arise, is liable for injuries caused by his negligent discharge of those duties. It matters not whether he makes money or profit by means of discharging the duties, or whether it be a corporation or an individual who has undertaken to discharge them. It is also immaterial whether the person is guilty of negligence by himself or by his servants. If he elects to perform the duties by his servants, if, in the nature of things he is obliged to perform the duties by employing servants, he is responsible for their acts in the same way that he is responsible for his own."

It seems to me that the error in the reasoning of the opinion in the *Powers Case, supra,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372, upon which its conclusion is based, consists in this: The cases of common employment, of athletic sports, and of the good Samaritan, who, in an individual instance, takes to his home a wounded stranger for care, are considered as the same in principle as that of a hospital established with the money of a number of persons who are good Samaritans for the purpose of conducting the business of rendering the service of care to wounded strangers. The cases are not analogous. In those of common employment, there is no undertaking of any duty by one fellow-servant to the other. The same is true of those voluntarily associating themselves together while engaged in athletic sports. And, in the case of the individual instance of the action of a good Samaritan stated, that, upon well settled principles, would not constitute the conduct of such a business on the part of the good Samaritan—it would not constitute an undertaking on his part to render the service of care of the wounded person, but merely to furnish to the latter the use of the house as it stood and such ministering care as the facilities and servants in that home, chosen, not for that, but for other purposes, and not held out to be suitable or competent for that purpose, might perchance render in the emergency in which the stranger is found until such time as he, or those owing him the duty to act in the premises, may obtain from some other source some actual undertaking of the rendering of the service of care. Whereas, in the case of the hospital, the material distinction is that it conducts a business of rendering the service of the care in question; it holds itself out as undertaking to perform such service; it tenders such service as an actual under-

taking on its part; and when such tender is accepted by any one, the duty of performing the undertaking attaches.

If, indeed, the conduct of a patient in entrusting himself to the care of a charity hospital (or, as in the case in judgment, if the conduct of the father in entrusting his infant child to the care of the hospital), was not governed, *i. e.,* induced by the unqualified undertaking on the part of the hospital of the duty of performing the service of proper ministerial care of and attention to the patient, for the reason that he actually or constructively knew at the time the relationship of patient was established that the hospital did not undertake to do more for its patients than to use due care in the selection of its servants who might have the care of the patients; in such case it would be true that the patient (or, in the case in judgment, the father for the infant patient) would be deemed to have impliedly agreed to assume the risk of the negligence of such servants as were selected with due care. And this, in truth, is the extent of the holding on this subject in the opinion of the Virginia court in *Hospital* v. *Thompson,* 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025.

But it is apparent that this situation exists only where the hospital does not hold itself out to the public as doing the business of undertaking the unqualified duty of performing the service aforesaid, and the latter fact is actually or constructively known to the patient, or the person acting for the patient, at the time the relationship of patient is established. In the absence of actual qualification in the tender of service by the hospital, as aforesaid, the qualified duty of service cannot be inferred from the mere fact that the service is gratuitous. The gratuity is immaterial. The material fact is what service was tendered— was actually undertaken—by the hospital, and was actually expected by or for the patient to be performed, which ex-

pectation governed or induced the establishment of the relationship of patient.

In *Tucker* v. *Mobile Infirmary Ass'n*, 191 Ala. 572, 68 So. 4, L. R. A. 1915-D, 1167, the fact was that the injured patient paid full compensation for the services received. It does not appear whether the patient knew or did not know that the hospital was a charitable corporation. In reference to the principle of "implied assent" or the "assumption of risk" aforesaid, this is said in the opinion of the court in such case: "The principle, if held to be sound, must rest upon the fact that it is giving and receiving of charity that creates the exemption, and not the nature of the institution administering it." And the court holds that, in that case, the patient did not in fact accept charity, and, hence, that the principle mentioned had no application. That is to say, even if the qualified undertaking aforesaid would be inferred from the giving and receiving of the gratuitous service, that inference would not arise unless the fact that the service was to be gratuitous was known to the recipient of it at the time of its acceptances and was so accepted.

In *Stewart* v. *California Medical, etc., Ass'n*, 178 Cal. 418, 176 Pac. 46, the injured patient paid the full price asked by the hospital for the services rendered, and the patient "had no knowledge that the hospital was, or claimed to be, a charitable institution." In the opinion of the court, in reference to the principle of the "assumption of risk" aforesaid, which is referred to as the "rule" enunciated in *Basabo* v. *Salvation Army*, 35 R. I. 22, 85 Atl. 120, 42 L. R. A. (N. S.) 1144, this is said: "* * * if this rule is followed, the defendant could hardly claim to be thereby relieved of responsibility, for the reason that the plaintiffs had no knowledge whatever of the charitable character of the organization."

The question under consideration is a pure question of fact. The majority opinion infers that there was a tender by the hospital of a qualified or limited service from the bare circumstance that it is a charitable institution. It is precisely at this point that I find myself unable to concur in that opinion. I do not think that because the hospital *may have* tendered a qualified service it must be inferred that it did so.

It affirmatively appears from the record before us that the father, who established the relationship of patient of the infant, did not know at the time that the hospital was a charitable institution, or claimed to be. He undertook to pay the full price asked by the hospital for the service. The hospital undertook to render the service without any qualification. It thereby held itself out as doing the business of undertaking the unqualified service aforesaid—precisely the same business as that done by non-charitable hospitals, and in competition with the latter. That being the character of the business, surely the mere purpose with which it is done cannot change its character. In the case in judgment there was, therefore, as it seems to me, a tender and acceptance of an unqualified service, from which arose the duty on the part of the hospital of performing the service with reasonable care, as aforesaid.

This view of the law is in accord with the majority holding of the courts in railroad and mine hospital cases; is in harmony with general principles; is also, as I am deeply convinced, in accord with true policy; and will induce, in the ultimate result, the greater efficiency of such public charities as charity hospitals, as it will, upon the whole, greatly enlarge their beneficial service. Reasonably efficient service is, after all, the only service which can be regarded as true charity. And in the absence of mutual agreement for less, or of governmental institutions ren-

dering a less service (where the somewhat antiquated maxim that "The king can do no wrong," is in substance put into force and shields the Commonwealth, and its political subdivisions, when acting as agencies of the State in governmental matters, from the application of the wise general rule of the common law aforesaid), I feel that the courts should firmly apply the general rule of the common law.

The Virginia cases of *Richmond* v. *Long*, 17 Gratt. (58 Va.) 374, 94 Am. Dec. 461, and *Maia* v. *Eastern State Hospital*, 97 Va. 507, 34 S. E. 617, 47 L. R. A. 577, rests upon the principle that the corporations involved were acting as agencies of the State in governmental matters. It is recognized by all the authorities that such a case as that in judgment does not fall within that principle.

Saunders, J., also dissents.