**BODENHEIMER v. CONFEDERATE MEMORIAL ASS'N.**

No. 895.

District Court, E. D. Virginia.

Dec. 1, 1932.

Parrish & Butcher, of Richmond, Va., for plaintiff.

R. H. McNeill, of Washington, D. C., and Archie Elledge, of Winston-Salem, N. C., for defendant.

WAY, District Judge.

This is an action instituted by Mrs. Bodenheimer, a citizen and resident of North Carolina, against "Confederate Memorial Association," a corporation chartered under the laws of Mississippi.

In her declaration plaintiff alleges that defendant is the owner of a parcel of land situate in the city of Richmond, on which is located a building known as "Battle Abbey," in which building defendant conducts a mu-

seum and art gallery to which admissions are charged to the members of the public; that on the 28th of November, 1931, in company with her husband, she visited the building and grounds so owned and operated by defendant, paying the usual admission fees charged by defendant to members of the public, and, upon the payment of such fees, she and her husband entered "Battle Abbey," and, after viewing the exhibits, met the superintendent, who invited them to visit the buildings and grounds known as "Confederate Soldiers' Home," located nearby. Plaintiff alleges that she and her husband accepted the invitation, and in leaving "Battle Abbey" by a regular exit they passed over a concrete walkway on the property of defendant, maintained by it for the use of plaintiff and others visiting "Battle Abbey," which walkway it is alleged, due to improper and negligent construction and to improper repairs, had become broken, buckled, and uneven, thereby rendering it unsafe to walk thereon; that said walkway had been in such bad state of repair for a long time prior thereto and defendant's agents and servants had failed to repair the same, although the condition of the walkway was well known to them and to defendant; that as plaintiff emerged from the building, and while she was passing over the walkway in question, and in the exercise of due care for her own safety, she stepped on a part of the walkway where the same was buckled and broken, which gave way in such manner as to throw her violently against the walkway, as a result of which fall she sustained serious permanent injuries.

Plaintiff further alleges in general terms that defendant corporation was also guilty of negligence in the selection of its agents, servants, and employees whom it had placed in charge of the museum and grounds, but there is no showing in the declaration of any causal connection between the alleged failure to exercise reasonable care in the selection of its agents, servants, and employees and plaintiff's injuries.

■ Defendant pleaded the general issue, and filed a special plea in which it avers that defendant association is a charitable institution, and for that reason cannot be held liable to plaintiff for the damages sustained by her as the result of the negligence charged in the declaration. With its special plea defendant filed a duly certified copy of its charter of incorporation, from which document it appears that the purposes for which defendant association was formed are as follows:

"The purpose of this incorporation is, to erect at some suitable place to be hereafter selected as herein provided for, a building to be known and designated as The Confederate Memorial Institute and to collect, arrange and preserve therein statues, portraits, photographs and other pictures of the soldiers and sailors of the Confederate States Army and Navy of every rank, from that of the private to that of the General Commanding, who served faithfully the Confederate Cause, and also of civilians, including our noble women, who were devoted to the South; also such archives, relics, mementoes, records, histories, papers, books, orations, poems, paintings, pictures and literature of every kind, and everything else illustrative of the self-sacrifice and denial of the Confederate soldiers and sailors, and the Southern people, their courage and heroism during said war, and their constancy and devotion to the cause for which they fought, together with the official acts of each of the States of the Southern Confederacy, and all debates therein and proclamations of their Governors, just before, during, and just after the war, and all other matters illustrative of the character, life, spirit and motives of the South and her people, including the period anterior, during and subsequent to the war, *calculated to enable future historians to obtain such reliable facts and data as will assist them in writing fair, accurate and impartial history of said war and of the South, the said Association being educational, patriotic and historical at all times.* And this Corporation shall have the right to compile and publish, and to have compiled and published books, plans, charts, and other papers and documents relating to the purposes for which it is organized and to apply for and hold copyrights and patents necessary for its protection and to sell and dispose of the same." (Italics supplied.)

Plaintiff traversed the special plea; by agreement of the parties a jury was waived, and all matters of law and fact presented by the special plea were submitted to the court for decision. At the hearing on the special plea, defendant, to show that it had adhered in its activities to the purposes set forth in its charter of incorporation, introduced two witnesses who described somewhat in detail its activities from its incorporation until the present time. No other testimony was offered by either side. This testimony shows beyond doubt that those in charge of the association have at all times adhered strictly to the purposes for which it was originally created.

From the testimony it clearly appears that the funds derived from admission fees are scarcely sufficient to pay the necessary expenses of keeping "Battle Abbey" open for the benefit of historians, students, and the general public; that there has never been any profit from the operations of the association, and, even if there were profits therefrom, the trustees, under the terms of the charter, would be required to expend such profit in the acquisition of additional historical data; that defendant is a nonstock corporation, and the sole purpose for which the institution is maintained is to make available for historians, students, and the public generally valuable Confederate historical documents, portraits, paintings, and the like, which purpose is wholly public in its nature; and that the only paid employees of the association are a hostess, a superintendent of buildings and grounds, and an assistant to such superintendent. It further appears from the testimony that the total income for the year was $4,665, $2,565 of which was derived as income from endowments and from other sums donated for the purpose of furthering the objects of the association, that the remaining $2,100 was derived from gate receipts or fees, and that the association ever since its organization has been, and still is, dependent upon the voluntary contributions and services of its members and friends for the continuance of its existence and activities.

Is defendant a strictly charitable institution in the broader and more inclusive sense? The text-books and decisions contain numerous definitions and descriptions of charitable institutions, but it is deemed desirable to refer here to a few only of them. In Ettlinger v. Trustees of Randolph-Macon College (C. C. A. 4th) 31 F.(2d) at page 870, it is said:

"It is clear that a corporation is to be deemed eleemosynary or charitable where its property is derived from charitable gifts or bequests and is administered, not for the purpose of gain, but in the interest of humanity; and an educational institution, established and endowed by private charity, falls clearly within the classification."

In his "Notes on Municipal Corporations" (1922 Ed., pp. 101, 102), Professor Lile gives the following illustrations of charitable trusts and organizations:

"For convenience these trusts are usually incorporated, and such corporations are termed charitable corporations. Familiar illustrations of such public charities or private foundations (i. e. not owned, or directly controlled by the state, nor supported by public funds) are educational institutions, like Washington and Lee University, and the numerous other colleges in Virginia, not established by the State; hospitals not conducted for profit; endowed fellowships and scholarships; funds for education generally (e. g. the Slater fund for the education of negroes); orphan asylums; widows' homes; pension funds for teachers, or others (e. g. The Carnegie Foundation for the Advancement of Teaching); funds for combatting disease (e. g. The Rockefeller Foundation); *funds for public libraries, art galleries, etc.;* Young Men's Christian Associations; The Salvation Army, and religious organizations generally.

"It is especially to be noticed that *the circumstances that some or all of the beneficiaries of such trusts are charged fees for services rendered or benefits enjoyed, does not alter the nature of the trust,* since the fees so received are converted into the corporate treasury and become at once as completely dedicated to the purposes of the trust as the original *corpus.* One distinctive feature of such corporations is that *no dividends are paid out as private profit to individuals.* A college or hospital, therefore, requiring payment of fees or other compensation from students or patients may be as completely and technically a charitable institution as a like institution whose services are free to all who apply." (Italics supplied.)

That the query above stated must be answered in the affirmative is hardly open to serious controversy. It is at once apparent from the charter and the testimony that all of defendant's purposes and activities are absolutely foreign to any thought of pecuniary or personal profit, and that the real purpose of its incorporation and perpetuation is essentially a public purpose.

Therefore, it seems to me that the sole remaining issue presented by the pleadings and the proof, is whether or not, assuming that defendant's representatives, employees, and servants, in the course of their work of maintaining the institution in question, were guilty of negligence in the construction and maintenance of the walkway in question leading from "Battle Abbey," and that such negligence was the sole proximate cause of plaintiff's injuries, she is entitled to recover against defendant a judgment therefor, and to enforce such judgment by appropriate process against the property and assets of defendant association.

Decisions in cases more or less similar to the instant case are numerous, but not without serious apparent conflict in their conclu-

sions. To undertake to analyze and distinguish many of them for the purpose of the decision of the instant case would be to extend the opinion unduly and unnecessarily. Many of the decisions are discussed and reviewed in the opinions in the following cases: Ettlinger v. Trustees of Randolph-Macon College (C. C. A.) 31 F. (2d) 869–873; Weston's Adm'x v. St. Vincent's Hospital, 131 Va. 587–618, 107 S. E. 785, 23 A. L. R. 907; Hospital of St. Vincent of Paul v. Thompson, 116 Va. 101–119, 81 S. E. 13, 51 L. R. A. (N. S.) 1025; and Roosen, Adm'r, v. Hospital, 235 Mass. 66, 126 N. E. 392, 14 A. L. R. 563, and the notes to the latter case found in 14 A. L. R. pages 572–604.

Recovery of damages for personal injuries was sustained in Hospital of St. Vincent of Paul v. Thompson, supra, 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N.. S.) 1025, on the ground that the injured party was not *a beneficiary of the charity but a stranger thereto,* she having, at the request of a sick friend who was entering the hospital for treatment, accompanied the latter for the purpose of looking after the sick friend until she was placed in charge of the hospital authorities. The court held that to such stranger to the charity, the hospital owed the duty to exercise ordinary care to have its premises in a reasonably safe condition, and that it had failed to perform that duty, as a proximate result of which negligence Mrs. Thompson was injured by falling into an elevator shaft.

In Weston's Adm'x v. Hospital, supra (decided in 1921) 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907, recovery against the hospital was denied in a suit by the personal representative of an infant to recover damages for death by wrongful act. The facts on which recovery against the hospital was sought were such as to make a strong sympathetic appeal. In that case, the husband of an expectant mother engaged a room for her as a *pay* patient, to be occupied by her during confinement. The infant, immediately after birth, was delivered to the night nurse, an employee of the hospital, and died soon afterwards as the sole result of burns caused by a hot water bottle negligently applied by the nurse in the course of nursing furnished by the hospital. The court held that the hospital owed the duty to decedent to exercise due care in the selection and retention of the nurse in charge of the patient; that no negligence in that respect was shown, and, therefore, denied recovery against the hospital. The basis of the decision was that *the infant, being a beneficiary of the charity, although a pay pa-* *tient,* there could be no recovery for its death in the absence of a showing that the hospital authorities had been guilty of negligence in the selection and retention of the nurse whose negligence caused the death.

In Ettlinger v. Trustees of Randolph-Macon College (C. C. A.) 31 F. (2d) 869, 870 (1929) plaintiff, a student in Randolph-Macon Academy, sought to recover damages from the trustees of Randolph-Macon College, Inc., for personal injuries sustained by him when that academy was burned. The facts are stated in the opinion by Circuit Judge Parker, as follows:

"This action was instituted in the court below in behalf of one Reginald Ettlinger, hereafter called the plaintiff, against the Trustees of Randolph-Macon College, Inc., as defendant, to recover damages for personal injuries sustained by him when the Randolph-Macon Military Academy at Front Royal, Va., was destroyed by fire. The academy was owned by the defendant, and plaintiff was a student therein. He alleges that defendant was negligent in not maintaining the electric wiring and fixtures in the academy in proper condition, in not providing that building with adequate fire escapes, and in not maintaining a night watchman on the premises. The trial judge directed a verdict for defendant, and from a judgment thereon plaintiff has appealed.

"The defendant is a nonstock corporation chartered and organized at the instance of the Conference of the Methodist Episcopal Church of Virginia, for the purpose of carrying on the work of education. It operates a system of schools and colleges, not for the sake of profit, but for the education and enlightenment of the people. Its property has come to it through charitable gifts and bequests, and this together with what is received from tuition is used for the purpose of education. It makes special rates to sons of ministers and young men studying for the ministry and loans to needy and deserving students. A charge is made for board and tuition, but the amount realized therefrom does not by any means equal the cost of the work which is being carried on. The Military Academy at Front Royal was one of the schools operated by defendant, *and plaintiff was attending it as a regular paying student."* (Italics supplied.)

After referring to the different theories upon which recoveries against charitable corporations and institutions have been denied, Judge Parker continued:

"A policy of the law which prevents him who accepts the benefit of a charity from suing it for the torts of its agents and servants, and thus taking for his private use the funds which have been given for the benefit of humanity, which shields gifts made to charity from 'the hungry maw of litigation' and conserves them for purposes of the highest importance to the state, *carries on its face its own justification, and, without the aid of metaphysical reasoning, commends itself to the wisdom of mankind.* It is significant that almost without exception the courts, while giving different reasons for the rule, have not hesitated to apply it where the one seeking to enforce liability against a charitable institution is one who has accepted benefits from it." (Italics supplied.)

However, counsel for plaintiff contends that the instant case is distinguishable from the three cases last above cited and referred to in that here the declaration charges that defendant corporation was negligent not only in permitting the walkway in question to become and remain in an improper and unsafe condition, but was also guilty of negligence and lack of care in the selection and retention of the agents, servants, and employees whom it placed in charge of the museum and grounds.

It is true that in Weston's Adm'x v. St. Vincent's Hospital, supra, it was held that the hospital owed the decedent the duty to exercise due care in the selection and retention of the nurse in charge of the patient and exempted the hospital from liability in that case because the evidence failed to show any negligence of that character.

But in Ettlinger v. Trustees of Randolph-Macon College, supra, the court used this very significant language:

"It is true that many of the cases have stated the rule to be that a charitable corporation is not liable for the torts of its agents where due care is used in selecting them. This, however, is a correct statement of the rule properly applicable in the case of ordinary private corporations who employ physicians and surgeons to treat their injured employees. See Metzger v. Western Maryland R. Co. (C. C. A. 4th) 30 F.(2d) 50; Powers v. Massachusetts Homeopathic Hospital (C. C. A. 1) 109 F. 294, 298, 65 L. R. A. 372. *We do not think that it is properly applicable in the case of charitable corporations.* The subject was thoroughly considered by Chief Justice Rugg of Massachusetts in Roosen v. Peter Bent Brigham Hospital, supra, 235 Mass. 66, 126 N. E. 392, 14 A. L. R.

563, *and we agree with the conclusion which he reached in that case.*" (Italics supplied.)

It will be noted that Judge Parker referred particularly to Roosen v. Hospital, 235 Mass. 66, 126 N. E. 392, 14 A. L. R. 563. An examination of the report of the Massachusetts case will at once disclose that it holds squarely against the contention here made on behalf of plaintiff. In the opinion in the Roosen Case, 235 Mass. 66, 126 N. E. 392, 394, 14 A. L. R. at page 567, the court used this language:

"The case at bar presents, as one of its main questions, whether a hospital can be held liable for the negligence of its managing officers in selecting incompetent servants and agents."

And in the Ettlinger Case Judge Parker quoted from the Roosen Case with reference to that very question, as follows:

"There is no sound distinction in reason between the liability of a hospital for the negligence of its inferior agents and its liability for the carelessness of its managers. The conduct of both relates to the execution of the charity. The inferior agents usually work for pay, while the managing officers as matter of common knowledge generally undertake the administration of the public charity without compensation, solely out of public spirit in a desire to serve the general welfare. If the hospital is held responsible for their acts of negligence, the funds devoted to the relief of suffering humanity must be diverted in the one instance to the same extent and manner as in the other to the payment of claims wholly foreign to the purposes of the public trust."

I am, therefore, unable to agree with counsel that what was said in the Ettlinger Case with reference to the negligence of the management of charitable institutions in selecting and retaining employees and servants, is a mere dictum and without any binding force on this court in the instant case. It is binding in both reason and authority.

It is also urged on behalf of plaintiff that the allegations of the declaration show that Mrs. Bodenheimer was not a beneficiary of the charity maintained by defendant but a stranger thereto, and that, therefore, the decision in this case should be controlled by the principle announced in Hospital of St. Vincent of Paul v. Thompson, supra, and similar cases, and not by the decision in Ettlinger v. Trustees of Randolph-Macon College. In support of that contention, an effort is made to distinguish this case from the Ettlinger Case, on the ground that plaintiff here was not

a beneficiary of the charity maintained by defendant, but merely paid an admission fee for the privilege of seeing the exhibits; that as to her, the situation was not different from what it would have been had she entered a private museum or art gallery maintained for profit. It seems to me that the error in such contention is in ignoring the real purpose for which defendant maintains Battle Abbey. That purpose is to collect, preserve, and make available to historians, students, and the general public historical material and data, which purpose is essentially charitable in its nature since it is devoid of any idea of material profit. It is true no charge is made to historians and students while a comparatively nominal charge is made to the members of the general public, for the privilege of viewing and studying the historical material owned by the institution. The reason for allowing to historians and students free access is, no doubt, that in this way the institution may, through them, the more successfully convey to the public the historical information which it has made available, as it is reasonable to assume that historians and students, in many cases at least, will not only acquire the historical information themselves but will probably impart it to many others and thereby greatly extend the public benefit of the institution. In the case of members of the general public the situation is different. Some probably visit the institution through curiosity, while many others visit it in order to obtain for themselves the benefit of the historical data there assembled, but not with any definite intention of imparting the information they thus obtain to other members of the public.

It seems to me that this is a sound distinction between the different classes of persons who patronize the institution, and that, for all essential purposes, plaintiff, although she did pay an admission fee for the privilege of entering Battle Abbey and viewing the exhibits there, was as much a beneficiary of the charity maintained by defendant as was the student in the Ettlinger case a beneficiary of the charity maintained at Randolph-Macon Academy. In one case, plaintiff was a pay student at a preparatory school, while in the instant case, plaintiff was a pay patron of the institution maintained by defendant. There is no sound distinction between this case and the case mentioned, and the conclusion from the facts is inevitable that plaintiff was a beneficiary of the charity maintained by defendant.

That it is a hardship on plaintiff to have sustained the serious injuries of which she complains and yet be denied recovery of damages therefor is not open to controversy. Many similar cases in which recoveries have been denied may be found in the reports. Notwithstanding that such hardships occur from time to time, our Circuit Court of Appeals and many other courts, as indicated in the decisions above cited and quoted, have for sound reasons taken the view that persons charitably disposed should be encouraged to make charitable donations and to establish and maintain charitable institutions, rather than be deterred from such course by fear that their donations are liable to be consumed in paying damage claims which result from the negligence and default of the agents, servants, and employees of such institutions.

In this connection it may not be amiss to point out what would very probably occur in this case were plaintiff permitted to maintain her action for damages and to obtain a verdict and judgment against defendant. Such verdict and judgment would probably be substantial. The judgment could be paid only from donations heretofore or hereafter made by friends of the institution. If it were not paid, execution would in due course issue. If the execution were not satisfied through the intervention of liberally disposed friends of the institution, it would become necessary for the marshal to levy upon the invaluable historical material which defendant has collected and is preserving in Battle Abbey solely for the benefit of this and future generations. This historical material, or a great part of it, would have to be sold at public auction to satisfy the execution. The institution would probably be disrupted with the result that no doubt it would be impossible ever again to assemble such an extensive and valuable collection of historical data, so that the loss to the public would be irreparable.

For the foregoing reasons, a judgment sustaining the special plea and dismissing the case will be entered upon presentation.